# MOUNT VERNON CAR MANUFACTURING COM-PANY v. HIRSCH ROLLING MILL COMPANY, Appellant.

### Division Two, December 30, 1920.

1. **CONTRACT: Sale and Purchase: Modification: Action for Damages.** Where the original contract of purchase and sale was so modified as to create a different contract, as was done in this case, as is abundantly shown by the exchange of letters and telegrams set out, the party demanding damages for a breach should declare upon the modified contract, and not upon the original.

2. ———: ———: **Accord and Satisfaction.** If the original agreement was still unperformed and its modification did not change all of its obligations but left a part of them still to be performed, the modification was not an accord and satisfaction.

3. ———: ———: **Consideration.** An agreement made in substitution of an executory contract of prior date annuls the former contract, and is itself a sufficient consideration for the release of the former's obligations, and the party suing for damages for its breach must declare upon it as modified; but in order to constitute a consideration the substituted arrangement must contain a change of the obligation of each party. If the obligation of only one party is affected by the new arrangement, and the other party receives nothing additional and is relieved of no duty, there is no sufficient consideration for the modified agreement.

4. ———: ———: ———: **Purchase and Sale.** By the original contract plaintiff was required to deliver 1050 tons of scrap iron before the first of April, and in return defendant was to deliver during March and April 1050 tons of bar iron, to be made to comply with designated specifications; neither party delivered within the time specified, and in June both parties in writing were relieved of the obligation to deliver within the times specified. instead of each being required to furnish the other 1050 tons, defendant was required to furnish so much of bar iron as it had already manufactured and was in its yards, the total amount estimated at 500 tons, and plaintiff was to ship an equal amount of scrap iron, the shipments. in each case to be made immediately, and defendant was further relieved of the obligation to make the bar iron comply with the former specifications. *Held*, that there was a sufficient

change of the obligations of both parties to constitute a consideration for the new arrangement.

5. ——: ——: ——: **Questions for Court and Jury: Instructions.** If from the evidence there is no doubt that the changes in the obligations of both parties constituted a sufficient consideration for the modified contract or that it was accepted and agreed upon in lieu of the former, it is error to give instructions permitting plaintiff to recover damages for a breach of the original contract; but if the facts raise a doubt as to whether the modified contract was accepted in lieu of the first, then the question is one for the jury.

6. **SHIFTING POSITION: Invited or Coerced Error: Appellate Practice: Waiver.** If a party invites error by submitting his cause upon a certain theory to the trial court, he will not be heard on appeal to question the propriety of that theory. But if the party is drawn into the error by the attitude of the trial court; if the court disregards or overrules his correct theory and forces the issues upon an incorrect theory, the party so coerced, whether plaintiff or defendant, does not, by asking instructions conforming to the false theory, waive his right to assert upon appeal that the theory upon which the case was submitted to the jury was erroneous. If he voluntarily chooses an incorrect theory, he cannot complain; but he does not waive his right to complain of coerced error, where he submits to it as his only chance to escape injury.

7. ——: ——: **Modified Contract: Counterclaim: Appellate Practice: Waiver.** Plaintiff and defendant entered into a contract whereby plaintiff was to deliver 1050 tons of bar iron and defendant was to deliver 1050 tons of scrap iron, each at designated prices, and plaintiff sues for damages for breach of that contract. Defendant by answer alleged that the contract was so modified that it was to deliver 500 tons of bar iron then on hand, and plaintiff was to deliver an equal-amount of scrap iron, and that defendant had delivered 117 tons, but plaintiff had delivered nothing; and the evidence sustains these allegations. Defendant also set up a counterclaim for damages for plaintiff's failure to deliver the 500 tons of scrap iron. The court refused defendant's demurrer, and an instruction declaring that if the modified agreement was made plaintiff could not recover, but, ruling that the original contract was still in force, peremptorily instructed the jury to assess plaintiff's damages at the market value of so much of the 1050 tons of bar iron as was not delivered, and at defendant's request directed a verdict for defendant upon a counterclaim for breach by plaintiff of the original contract. The jury found plaintiff's damages were $27,060, and defendant's on its counterclaim $12,720, and

judgment was rendered for plaintiff for $14,340, from which defendant alone appeals. *Held*, that the instruction directing a verdict upon defendant's counterclaim was erroneous on any theory of the case, because defendant had not declared on the original contract in its counterclaim, but had declared on the modified contract and for its breach had by its counterclaim set up a demand for damages; but defendant, by asking said instruction, being coerced to do so by the court's attitude in ruling the original contract to be still in force, did not waive its right to assert on appeal that error was committed in refusing its demurrer and that error was further committed in refusing its instructions declaring that plaintiff could not recover upon the original cause of action, if the jury found that said contract had been modified into a new contract by the subsequent agreements. *Held*, further, that the defendant in submitting its instruction on said counterclaim was not in the position of a plaintiff who chooses his ground of action, but like any other defendant, since his counterclaim, under the statute, is one that arises "out of the contract or transaction set forth in the petition as the foundation of plaintiff's claim," and cannot be dismissed in case of an adverse ruling and brought over again.

8. **SINGLE JUDGMENT: Counterclaim: Verdict for Both Parties: Appellate Practice.** Where the verdict for plaintiff for breach of contract for sale of goods was for $27,060, and for defendant on its counterclaim for $12,720, and there was one indivisible judgment for plaintiff for $14,340, from which defendant alone appeals, the judgment cannot be reversed so far as it affects recovery by plaintiff and judgment rendered for defendant on its counterclaim. There is only one judgment with which the court has to deal, and it is the final judgment rendered by the trial court, and the proper decision is a reversal of the judgment and a remand of the cause.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor*, Judge.

REVERSED AND REMANDED.

*A. L. Hirsch, Abbott, Fauntleroy, Cullen & Edwards* and *Curlee & Hay* for appellants.

(1) The court erred when it ruled that the new contract of June, 1917, as set forth in defendant's answer (and as was proven by plaintiff itself, when it introduced

the respective letters and telegrams of June 21, 22, 23 and 28, 1917, respectively), did not supersede and do away with the contract which is sued on in the petition. These letters, and all the facts surrounding the matter, were introduced by plaintiff, and it clearly, and without dispute, shows that the contract sued on in the petition had been compromised, abandoned, and a new arrangement entered into by the parties, as shown by the aforesaid June letters and telegrams, which is the basis of the contract set up in the answer as being a different contract from that set forth in the petition, and which said amended or substituted contract was the only one existing between the parties at the time the suit was commenced. That suit should have been brought, if at all, upon the substituted or amended contract, and not on the old contract, which is set forth in the petition, is the law of this State. The suit should have been brought on the substituted contract. Carman v. Hannah, 182 Mo. App. 365; Henning v. Ins. Co., 47 Mo. 430; Gifford v. Willman, 187 Mo. App. 38; Chouteau v. Jupiter Iron Works, 94 Mo. 388; Potato Growers' Assn. v. Clemens, 193 Mo. App. 656; McCoy v. Milbury, 82 N. J. L. 697; Flegal v. Hoover, 156 Pa. 276; Dieudonne v. Arco Co., 116 N. W. 1067; Tuttle v. Metz Co., 229 Mass. 272; Warden v. Houston, 92 Mo. App. 373; St. Croix Co. v. Seacoast Co., 114 Me. 521; Napa Co. v. Daubney, 63 Minn. 112. (2) The court erred when it refused, at the close of all the evidence, to give defendant's request for an instruction, that, upon the law and the evidence of the case, plaintiff could not recover ''upon the cause of action, which is sued on in its petition, and your verdict upon that cause of action which is set forth in the petition of plaintiff must be for the defendant.'' The case, as made by plaintiff's own evidence, shows that the contract sued on in the petition had been wiped out by the new contract, and suit should have been on the new, or substituted, contract. Conran v. Hannah, 182 Mo. App. 365; Henning v. Ins. Co., 47 Mo. 430; Gifford v. Will-

man, 187 Mo. App. 38; Ostrander v. Messner, 223 S. W. 441; Baase v. Bert, 43 Mo. 280; Lanitz v. King, 93 Mo. 518; Chouteau v. Jupiter Iron Works, 94 Mo. 388; Potato Growers v. Clemens, 193 Mo. App. 656. (3) The original contract, as set forth in the petition, no longer existed, even though the new contract was unperformed. Sioux City Co. v. Sioux City Co., 110 Iowa, 396; McCoy v. Milbury, 82 N. J. L., 697; Flegal v. Hoover, 156 Pa. 276; Dieudonne v. Arco Co., 166 N. W. 1067; Tuttle v. Metz Co., 229 Mass. 272; Warden v. Wooster, 92 Mo. App. 373; Metropolitan Co. v. Kamioner, 138 N. Y. Supp. 1067; St. Croix Co. v. Seacoast Co., 114 Me. 521; Napa Co. v. Daubner, 63 Minn. 112; Hughes v. Brennan, 24 D. C. App. 90. (4) Plaintiff must recover on the cause of action set up in his petition, and, if the answer set up on another cause of action, even though it shows a right of recovery in plaintiff, yet plaintiff cannot recover upon it until plaintiff has amended his petition. Perry v. Barrett, 18 Mo. 144; Reed v. Bott, 100 Mo. 62. (5) A case must be disposed of on the issues tendered, and upon none other. Proof cannot be considered which does not have its foundation in the allegation made in the pleadings, even though such outside facts are proven. Schworm v. Fraternal Society, 168 Iowa, 579; Hartwig v. Am. Co., 77 N. Y. Supp. 535. (6) The new agreement of June 21, 22, 23 and June 28, 1917, was either a compromise and settlement or a novation, ending all previous liability of defendant upon any other and previously existing agreement, which may have theretofore existed between the parties or all of them. McCoy v. Milbury, 82 N. J. L. 697. Such an agreement was "a compromise" of all rights therefore existing between the parties. "The parties to a contract may, at any time, rescind it, either in whole or in part, by mutual consent, and the surrender of their mutual rights is a sufficient consideration." Flegal v. Hoover, 56 Pa. 276 ; Warden v. Houston, 92 Mo. App. 373; St. Croix Co. v. Seacoast Co., 114 Me. 521. The new contract, if honestly made, to settle a bona-

fide disagreement between the parties, is good and binding upon the parties. Sunset Orchard Co. v. Sherman Co., 121 Minn. 5; Metropolitan Shirt Co. v. Nanioner, 138 N. Y. Supp. 1067. (7) The new contract was supported by a full and complete consideration. Laughman v. Pipe Co., 114 S. W. 453 (8) The plaintiff failing to object or except to the giving of this instruction and making no motion for a new trial in this case, and plaintiff not having taken any appeal from the verdict which the jury rendered in favor of the defendant for $12,720, plaintiff thereby acquiesced in and accepted that judgment, in favor of the defendant as being correct, and it is final. Mississippi Co. v. Somerville, 85 Mo. App. 265. The court can affirm the judgment upon the counterclaim and reverse the judgment in favor of plaintiff. R. S. 1909, sec. 1878. The court can reverse the case as to the issues involved in plaintiff's cause of action without disturbing the verdict, which virtually was by consent, in favor of the defendant. Schroeder v. Edwards, 267 Mo. 486; Crow v. Williams, 140 Mo. App. 454; Connelly v. Railroad, 169 Mo. App. 283; Boeckler v. Ry. Co., 10 Mo. App. 448; Hodges v. Bryant, 187 S. W. 624; McCall v. Jones, 85 Mo. App. 265. The verdict and judgment in favor of the defendant is a finality, and the plaintiff not having objected to that judgment, or appealed therefrom, it is binding. LeVee v. LeVee, 183 Pac. 775.

*Alroy S. Phillips* and *Bryan, Williams & Cave* for respondent.

(1) The sale of the iron and the sale of the scrap in the original agreement are independent covenants, upon each of which recovery can be had. Smith v. Crews, 2 Mo. App. 272; Butler v. Manny, 52 Mo. 505; Turner v. Mellier, 59 Mo. 535; Strohmeyer v. Zeppenfeld, 28 Mo. App. 272; Sawyer v. Christian, 40 Mo. App. 299; Springfield Seed Co. v. Walt, 94 Mo. App. 85; Hayden v. Railroad, 117 Mo. App. 95, 105; Coal Co. v.

Packing Co., 138 Mo. App 281; Fire-Proof Window Co. v. Cornice Co., 181 Mo. App. 326.   (2) The attempted compromise does not bar recovery on the original agreement.   (a)   There was no compromise, because the minds of the parties never met on its terms.   13 C. J. 263, 272.   (b) There was no consideration for the alleged compromise because appellant was already bound by the original agreement to do more than it agreed to do in the alleged compromise.   Lingenfelder v. Brewing Co., 103 Mo. 592; Koslosky v. Bloch, 191 Mo. App. 259.   (c) The alleged compromise was never fully performed, and the new promises therein, as distinguished from their performance, were not accepted in lieu of the original agreement.   There must be both accord and satisfaction.   1 C. J. 530, 567, 572; Goff v. Mulholland, 28 Mo. 399; Curtis v. Browne, 63 Mo. App. 431; Swofford Bros. Co. v. Gross, 65 Mo. App. 59; Gerhardt Realty Co. v. Assurance Co., 94 Mo. App. 359; Carter v. Railroad, 136 Mo. App. 724; Holland v. Rongey, 168 Mo. 19; Mc-Cormick Harvesting Co. v. Blair, 146 Mo. App. 379; Law Book Co. v. Corbett, 162 Mo. App. 74; Lumber Co. v. Gibson, 178 Mo. App. 706; Elliott v. Thomas, 185 Mo. App. 31; Erwin v. Jones, 192 Mo. App. 330; People's Bank v. Railroad, 192 Mo. App. 626; Simmons v. Printing Co., 201 Mo. App. 140.   (3)   Appellant is estopped to question the validity of the original agreement or the action of the trial court in submitting the case to the jury on the original agreement.   Any errors in this respect were waived by the appellant when it requested and the court gave an instruction directing a verdict for appellant on its counterclaim on the same theory, and particularly is this true with the appellant here insisting upon holding that verdict.   (a) A counterclaim is the same as a petition, and one asserting it has the same right as a plaintiff, to abandon it at any time before submission to the jury.   Waldron v. Merseal, 162 Mo. App. 380.   (b) While a defendant does not waive his objection to the refusal of the court to give

his instructions by asking for their instructions to meet those given for the plaintiff, the same rule does not apply to a plaintiff or to a defendant urging a counterclaim. Everhart v. Bryson, 244 Mo. 507; Seneca Co. v. Ellison, 184 S. W. 1177; Addison v. Talbert, 183 S. W. 364; Horse & Mule Co. v. Hatfield, 175 Mo. App. 296. (c) A party is estopped to predicate error on the submission of his opponent's case on the same theory that he has requested the submission of his own. 4 C. J. 712; Hogan v. Brady, 155 Mo. 659; Phelps v. City of Salisbury, 161 Mo. 1. (d) Where one has with knowledge of the facts, asserted a particular claim, title or right, he cannot afterwards assume a position inconsistent with such claim to the prejudice of another. Curtis v. Moore, 162 Mo. 442; Langsdorf v. Field, 36 Mo. 440; 16 Cyc. 785. (e) The appellant has accepted, and is seeking to hold its verdict which resulted from such acceptance, the benefits of the original contract, and it is thereby estopped to deny the existence, validity and effect of that contract. 16 Cyc. 787; State to use v. Laundry Co., 190 S. W. 953; Muehlbach v. Railroad, 166 Mo. App. 314; Cadematori v. Greager, 160 Mo. 352.

WHITE, C.—The plaintiff obtained a verdict against defendant in the Circuit Court of the City of Saint Louis, in the sum of $27,060, for a breach of contract; and the defendant at the same time obtained a verdict against plaintiff upon a counter-claim, also for a breach of contract, in the sum of $12,720, resulting in a net judgment for the plaintiff against the defendant of $14,340. The defendant alone appealed.

Plaintiff was a corporation engaged in the manufacture of railroad cars at Mt. Vernon, Illinois. The defendant was a Missouri corporation manufacturing bar iron in the City of Saint Louis. In September and October, 1916, the plaintiff and defendant began negotiations looking to a contract for the sale by defendant to plain-

tiff of bar iron, and the purchase from plaintiff by defendant of scrap iron. In defendant's first letter to plaintiff, September 26, 1916, it suggested "an exchange contract." In a letter of October 2, 1916, defendant spoke of a telephone conversation relating to an order by the plaintiff for bar iron and again mentioned a proposed arrangement as an "exchange for scrap." Subsequent letters passed between the parties in which the scrap iron was mentioned, always in connection with the bar iron, and to be shipped before the date of shipment of the bar iron; and each letter mentioning the amounts of bar proposed to be shipped by defendant to plaintiff suggested an equal tonnage of scrap iron to be shipped by plaintiff to defendant. Finally, after a telephone conversation in which the parties seemed to reach an unstanding, letters were exchanged October 30, 31, and November 1, 1916, as follows:

"Mt. Vernon, Ill., Oct. 30, 1916.

"Hirsch Rolling Mill Company,

St. Louis, Mo.

"Gentlemen:

In accordance with our understanding on the telephone today between the writer and your Mr. Marcus A. Hirsch, we have purchased from you 1,000 tons of merchant bar iron, to be made to Baltimore & Ohio specifications, for delivery during March and April of next year, specifications to be furnished in approximately 30 days from this date, at a price of $2.25 per 100 lbs. F.O.B. St. Louis.

"We are to sell you 1000 tons of steel scrap shearings and punchings at $16 per gross ton, delivered at St. Louis, the scrap material to be shipped along as we accumulate it from time to time, completing same about the first of April next year. We have several tons on hand that we can load out now and we will load one car of shearings and one car of punchings in order that you may see the character of scrap you are going to get.

"Yours truly,

"R. K. Weber,

Vice-Pres."

"RKW/SH.

"St. Louis, Mo., Oct. 31st, 1916.

"Mr. R. K. Weber, Pur. Agt.,

"Mt. Vernon Car Mfg. Co.,

"Mt. Vernon, Ill.

"Dear Sir:

"This confirms sale made to you over phone yesterday of 1000 tons of bar iron at $2.25 per cwt. base as well as purchase from you of 1000 tons of steel scrap at $16 per gross ton all f.o.b. cars our works St. Louis, and we await your orders to cover.

"Thanking you kindly for the business and trusting that this is only the beginning of a large and satisfactory business, between us, we are,

"Yours very respectfully,
"Hirsch Rolling Mill Company,
"Marcus A. Hirsch,
Pres. & Gen. Mgr."

"MAH.CS.

"St. Louis, Mo., Nov. 1st, 1916.

"Mt. Vernon Car Mfg. Co.,

"Mt. Vernon, Ill.

"Gentlemen:

"We have yours of the 30th ult., which just reached us and we have accordingly entered your order for 1000 tons of merchant bar iron for shipment in March and April of 1917, specifications to be furnished about 30 days from date, at $2.25 per cwt. base f.o.b. cars our works St. Louis. We will thank you for specifications as soon as possible.

"We have also entered purchased from you of the 1000 tons of steel scrap shearings and punchings at $16 per gross ton f.o.b. cars our works, St. Louis, this scrap material to be shipped as fast as you accumulate it and to be delivered by the first of April, 1917.

"As you stated you have a few hundred tons now on hand, we would appreciate if you would load up a large car of each, of shearings and punchings, separated, so that we may see the character of the scrap, loading same in open cars, and consigning same to the Hirsch Rolling Mill Co., Howard Station, Mo. Pac. Railroad, St. Louis.

"Thanking you for the business and soliciting your further favors and orders, we are,

"Yours truly,
"Hirsch Rolling Mill Company,
"Marcus A. Hirsch,
"MAH.CS.                                        Pres. & Gen. Mgr."

In February, 1917, by an exchange of letters, the contract was modified so as to provide for the delivery of 1050 tons of bar iron by the defendants to the plaintiff, and a delivery by the plaintiff to the defendant of 1050 tons of scrap, at the prices mentioned in the previous correspondence.

It will be noticed that the plaintiff was to complete the delivery of the scrap material to the defendant by the first of April, 1917, at $16 per gross ton, and the defendant was to ship the bar iron in March and April, 1917, at $2.25 per cwt. The plaintiff failed to comply with its contract; it shipped to the defendant prior to the first of April, 1917, only 414 tons of scrap iron; at that time the defendant had shipped to plaintiff only 30 tons of bar iron. Later the time for complete delivery of the bar iron was extended to June, 1919. The plaintiff, April 13, 1917, sent a statement to the defendant showing $6,594.55 as the amount due for scrap at that time shipped, and giving a credit of $1,336.05 for bar iron received, leaving a balance of $5,258.50, which the defendant then claimed to be due.

The plaintiff declared upon the contract mentioned shown by the letters of October 30, 31, and November 1, 1916, as modified in February, 1917. The petition alleges that the defendant agreed to sell and deliver to the plaintiff, during the months of March and April, 1917, a thousand tons of bar iron at the price of $2.25 per cwt., said bar iron to be made according to the B. & O. R. R. Co's. specifications; that the plaintiff later sent orders to the defendant specifying amounts, sizes and quantities of iron required; that the orders so sent were accepted by defendant; that later, in February, 1917, the contract was modified increasing by fifty tons the amount of bar iron to be delivered; that later the time for delivering the iron was extended to not later than July, 1917; the petition then alleges that the plaintiff performed all the conditions of said contract, that the defendant failed and neglected to perform the same, and failed to deliver 902 tons of the bar iron required by

the terms of the contract, whereby the plaintiff was damaged in the sum of $40,590, for which it asked judgment.

The petition does not mention the obligation of the plaintiff to deliver the scrap provided for in the contract.

The answer alleges that the contract was entered into October 30, October 31, and November, 1916, and contained the terms mentioned in the letters of those dates, which included the obligations of the plaintiff to deliver a thousand tons of scrap, shearings, and punchings, by April 1, 1917; admits orders and specifications were sent by the plaintiff to the defendant designating the kind and amounts of iron demanded at certain and specific dates; admits the modification of the contract in February, 1917, increasing by fifty tons the amount of bar iron to be delivered. The answer then denies that plaintiff had complied with its contract; denies certain specific allegations relating to the delivery as alleged in the petition, alleges the contract was conditioned on delays by strikes and lockouts, and that a strike occurred in defendant's works in May, 1917; denies that the defendant had failed to deliver 902 tons of bar iron as alleged in the petition, and denies defendant had been damaged in the sum alleged.

The answer then alleges that after the plaintiff had shipped a portion of the scrap which according to the contract it was under obligation to ship, a dispute arose between the plaintiff and defendant as to the meaning of the contract and what were the obligations and duties of the plaintiff and of the defendant, respectively, under it, and, in order to settle all disputes growing out of the contract or its modifications the plaintiff and defendant, on or about June 21, 22, 23, 1917, as evidenced by letters and telegrams of those dates, agreed between themselves that as soon as empty cars could be procured for loading, the iron which defendant had on hand in defendant's yard, and which had been inspected by the B. & O. Railroad Company, amounting to about five hundred tons, would be invoiced to the plaintiff at $2.25 per cwt., f. o. b. St. Louis, Mo., at defendant's works,

''if the said plaintiff would ship the defendant at the same time in exchange an equal tonnage of steel scrap, shearings and punchings, at $16 per gross ton f. o. b. defendant's works, St. Louis; to all of which defendant alleges that said plaintiff and defendant did then and there agree, and the said plaintiff and defendant did also agree that the same was to settle all matters and disputes which then and there existed between the said plaintiff and defendant, and the defendant alleges that said last named agreement was to and did take the place of all other and prior agreements which theretofore had existed between the plaintiff and defendant.''

The answer further alleges that pursuant to the last mentioned agreement the defendant shipped to plaintiff, and delivered, 117½ tons of bar iron from the 500 tons of iron which the defendant then had in its yard; that the plaintiff refused and neglected to ship to defendant a like amount, or any amount of steel scrap, shearings and punchings, provided for in said agreement, and by reason of the failure of the plaintiff to ship the scrap the defendant refused to ship the plaintiff any additional part of the said 500 tons of iron. The defendant thereupon prays judgment that the plaintiff take nothing by its suit.

The defendant then set up a counterclaim against the plaintiff for failure to comply with the terms of the contract last alleged, alleging that the defendant delivered to the plaintiff in accordance with the said contract three carloads of iron, amounting to 117½ tons; that the plaintinff failed and refused to ship or deliver a like amount, or any amount, of tonnage of steel scrap, which it had agreed to ship, whereby the defendant was damaged in the sum of $25,000, for which it asked judgment.

In reply the plaintiff said it shipped to the defendant in November, 1916, and in January, February and March, 1917, steel scrap in accordance with the original contract, amounting in all to the 414 tons; admits that the defendant had shipped to plaintiff 117½ tons of bar

iron, but alleges the same was shipped under the first contract mentioned; denies all the other allegations of the answer and counterclaim; and specifically denies that any strikes occurred in defendant's works.

Further replying to the answer and counterclaim the reply avers that the minds of the parties never met upon any compromise agreement in June, 1917, as alleged in the answer.

It will be seen that the effect of defendant's answer is to deny liability to the plaintiff upon the original contract because the plaintiff itself failed to comply with its part of the same, and because it was entirely changed by a substitute contract of June, 1917.

The plaintiff's contention with respect to this position of the defendant is, that the contract was not changed or modified in June, 1917; that the covenants obligatory upon the parties in the original contract were independent; that the agreement of the defendant to deliver the bar iron was not conditioned upon the delivery by the plaintiff to the defendant of scrap iron, and a failure of its obligation by the plaintiff would not prevent a recovery by it against the defendant on account of the defendant's failure to perform its obligation.

At the close of all the evidence the defendant asked an instruction to the effect that the plaintiff could not recover under the law and the evidence. This was refused by the court. The defendant then asked an instruction setting out the correspondence of June 21, 22 and 23, 1917, telling the jury if that correspondence was exchanged between the parties the plaintiff could not recover, which instruction was refused.

The defendant then asked several instructions upon the theory that the contract was changed in June, 1917, both affecting the plaintiff's right to recover on its cause of action, and the defendant's right to recover upon its counterclaim, all of which were refused. Some of those instructions required a finding of certain facts.

The court thereupon, holding that the original contract was still in force and not abrogated nor modified

by any arrangement in June, 1917, gave a peremptory instruction informing the jury that the defendant agreed to deliver to the plaintiff 1050 tons of bar iron, and directing them to return a verdict for the plaintiff in such sum as they should find from the evidence to be the difference between the contract price of the iron and the market price at the time and place of delivery, taking that portion of 1050 tons which they should find defendant failed to deliver.

Then at the request of the defendant the court instructed the jury that the plaintiff agreed to deliver to the defendant 1050 gross tons of steel scrap, punchings and shearings, and directed the jury to render a verdict in favor of the defendant and against the plaintiff on the counterclaim in such sum as they might find was the difference between the contract price and the market price at the time and place of delivery of such number of tons as the plaintiff had failed to deliver to the defendant. The jury accordingly, under that instruction, returned a verdict as stated.

The facts will be more fully considered in treating the points to be determined.

I. The appellant claims that the original contract entered into between the parties was modified by exchange of letters and telegrams in June, 1917, so that the plaintiff erroneously declared upon the original contract instead of upon the contract as modified. The respondent contends that the minds of the parties never met on the matter of modification of the contract and that there was no consideration for such change.

Contract:
Modification.

Both parties had failed to perform the original contract. The plaintiff had failed to deliver by April first, the amount of scrap as stipulated in the original contract, and the defendant had failed to deliver during April and May the amount of bar iron that the contract called for. The contract already had been modified in two particulars: the amount of tonnage in each case to be delivered by each party had been increased by 50 tons, and the time

of delivery by the defendant had been extended. The original arrangement was that the bar iron was to be made to the Baltimore & Ohio specifications. It is claimed by the defendant that these specifications called for iron which the defendant could not make with its appliances at its factory in St. Louis, and the plaintiff knew it, having inspected the works and having learned the character of the manufactured bar iron the defendant could produce. It is unnecessary to state the technical details of the specifications and the objections to them. It was claimed by plaintiff that parts of the steel scrap which it furnished to the defendant could not be manufactured into the bar iron which would meet their specifications, and that the defendant had no right to attempt to manufacture it into the product which the plaintiff had a right to receive. The defendant on the other hand claimed that it was understood all the time that the bar iron which it was to deliver to the plaintiff was to be manufactured out of the scrap which it was to receive.

There was an unusual demand for the manufactured product of both parties, and mounting prices during the time which elapsed from the inception of the contract until the alleged modification; the war had increased the demand and the value of all such products. It was exceedingly difficult for the plaintiff to get the iron it required to meet a contract it had with the B. & O. Railroad Company. The defendant also had difficulty in procuring material in order to meet the demands upon it. About the 19th day of June, 1917, when matters were in that unsettled state, after repeated demands by the plaintiff that the defendant perform its contract, and repeated protests by the defendant that the specifications of the B. & O. could not possibly be met because they were unreasonable and unjust, after great quantities of the iron which defendant had manufactured for the plaintiff had been rejected under those specifications, there was a meeting at the works of the defendant in St. Louis, at which Mr. Weber, Vice-President of the Mt. Vernon Car Manufacturing Company, inspectors for the B. &

O. R. R. Co., and others, were present. At that time the manufactured iron which the defendant had on hand was examined and Weber and the B. & O. inspectors had a consultation in regard to it, and there was also a conversation, characterized by more or less disagreement between Mr. Hirsch, representing the defendant, and Mr. Weber. At that time it was estimated that the defendant had on hand about 500 tons of bar iron which it had manufactured, a part of which had been rejected by the B. & O. inspectors. It also seemed to be perfectly evident that it was impossible for the defendant to manufacture the iron with the appliances and material at hand and accessible, which would meet the specifications, within a reasonable time.

Nothing resulted from the conference that day, but correspondence ensued which the appellant claims modified the original contract. On June 21, the plaintiff telegraphed the defendant inquiring whether the defendant had started shipping the iron, calling attention to the 500 tons in defendant's plant, and suggesting that the defendant comply with its obligation. The telegram contains this sentence:

"Please rush shipment this tonnage, and we will get together and adjust amicably balance tonnage you are evidently not prepared make."

In reply to that telegram defendant wrote the following letter:

"St. Louis, Mo., June 21st, 1917.

"Mt. Vernon Car Mfg. Co.,

"Mt. Vernon, Ill.

"Gentlemen:

"Your telegram received. With the object of settling matters between us, (notwithstanding the fact that a large portion of this bar iron has been sold as repeatedly explained to you on account of your and the B. & O inspector's repeated rejections) we will agree to ship you at once or as soon as empty cars can be procured for loading, out of bar iron re-inspected here

at our works a few days ago by Mr. Garcelon and Mr. Henthorn of the B. & O. Railroad and your Mr. Weber, as much as you desire, at $2.25 per cwt. base f. o. b. our works St. Louis, if you will ship us at the same time in exchange, an equal tonnage of your steel scrap shearings and punchings at $16 per Gross Ton f. o. b. cars our works St. Louis.

"This proposition is subject to immediate acceptance and is offered in the spirit of a compromise, and we do not admit any liability.

"Yours truly,

"HIRSCH ROLLING MILL COMPANY,

"MARCUS A. HIRSCH,

"MAH. CS      Pres. & Gen. Mgr."

The next day the plaintiff telegraphed the defendant, June 22nd, as follows:

"Mt. Vernon, Ill., June 22, 1917.

"Hirsch Rolling Mill Co.,

"St. Louis Mo.

"Your letter twenty-first. Please order in cars and start loading at once Baltimore & Ohio iron that has been accepted, including five-eighths round scant bars, which we will take in our own account and will see that you get equal tonnage scrap. It is important this iron be loaded quickly so we will know exactly what we are going to get of each item so can make up specifications for balance and place order without delay. This matter utmost importance, hope you will start loading immediately. Wire care number, initials as fast as loaded so we can trace shipments through.

"Mt. Vernon Car Mfg. Co."

And on the same day plaintiff wrote the following letter:

"June 22, 1917.

"Hirsch Rolling Mill Co.,

"St. Louis, Mo.

"Gentlemen:

"In confirmation of our telegram of this date:—

"In order that we may know how much of the B. & O. iron we will have to buy to complete our requirements, as must know how much of this iron we are going to get from you.

"I figure in a general way there ought to be about 500 tons of this iron that has not been accepted by the B. & O. people, that is now on your yard ready to be loaded out. This includes the 5.8 inches round that the B. & O. rejected, but which we will accept for our own account and use it on something else.

"Therefore, it is important that you load out all of the iron that you have so that we can check it up quickly and know just what iron we will have to buy to complete the B. & O. job. I trust that you will appreciate the importance of this, and will get a string of empties in and get a force of men loading this iron immediately, and we will cover your shipments of new iron with an equal tonnage of scrap at the price mentioned in your letter of the 21st, that is, $16 per gross ton f. o. b. your works.

"The most imortant thing to us now is to know just how much of this iron you have, so that we will know how much we will have to buy elsewhere to complete our requirements for the B. & O. contract.

"Of course the more of this new iron you can ship, the more scrap we will ship you, and the less iron we will have to buy to replace that which you have not furnished, and I trust that when the matter is all weighed out, you will have considerably in excess of 500 tons.

"Will you kindly do us the favor of either telegraphing or telephoning us the numbers of the cars as fast as they are loaded and delivered, so that we can trace them over, and keep them from getting tied up in St. Louis and East St. Louis terminals.

"Yours truly,

"RKW/BN                    Vice-Pres."

The defendant, in reply to plaintiff's telegram of June 22nd, telegraphed as follows:

"Received at 1 A DO 90

"CD, St. Louis, Mo., 3:40 P. M. June 22, 17.
"Mt. Vernon Car Mfg. Co.,

"Mt. Vernon Ill.

"Your telegram of even date received, taking from your telegram you accept our proposition of yesterday, will order cars and begin loading at once, we will expect pay for bar iron before it leaves our works, and we will pay you for your scrap before it leaves your works crediting you with the above five thousand dollars we owe you, you of course must ship your scrap immediately same as we will ship the bar iron, the above arrangements to constitute a full settlement of all matters between us, Wire.

"Hirsch Rolling Mill So. (Co.), 5:15 P. M."

The plaintiff, in answer to the telegram of June 22, wrote as follows:

"June 22, 1917.

"Hirsch Rolling Mill Co.,

"St. Louis, Mo.

"Gentlemen:

"We have your telegram of this date which we do not quite understand. It will not be at all satisfactory for us to pay you for the new iron before it leaves your works. We presume we are doing business with responsible and reliable business men, and we are not going to do business on any other basis. I am surprised beyond measure that you would put up a proposition to us in this way. This is not showing your good faith and confidence. You told us in your message yesterday that you would ship what iron the B. & O. people accepted that you now have on your yards, invoicing same at $2.25 per cwt., if we would ship you an equal tonnage of steel scrap, shearings and punchings, at $16 per gross ton, f. o. b. St. Louis, and this we have agreed to do, but we are not going to do business on the basis that either party to this transaction is dishonest. We will carry out our end and expect you to carry out your end.

"As I explained to you in our letter today, it is imperative that we know how much of this iron you have so we want you to make an extra effort to get it loaded and get it here so that we can tally it and check it against the B. & O. order and set how much we will have to get somewhere else, and it is very probable that you will ship all of your new iron before we can get the scrap loaded. We have fooled with this matter just about as long as we are going to. We have accepted your proposition made us by wire yesterday, and expect you to carry it out exactly as agreed without any further delay or fooling about it.

"You evidently do not appreciate the fact that if we can't get this iron from you and are not going to get it, we will have to buy it somewhere else, and we do not want to buy any more than necessary. We figure you ought to have at least 500 tons of the B. & O. iron, maybe more, and the more you have, the less we will have to arrange for elsewhere, and that is the thing we have to know very quickly.

"In viewing the entire transaction from beginning to end, your telegram is another one of those great surprises that comes to a man once in a lifetime. We will expect you to order cars in and load this iron just as fast as you can do it, and if you are not willing to do this, we will arrange to purchase the entire tonnage which you have failed to furnish on your agreement, and we will be compelled, therefore, to resort to the courts for reimbursement account of loss by your failure to carry out your agreement with us, but if you are in earnest about closing this matter out amicably, this is the time now for you to show your good faith and confidence in us for we are imposing equal confidence in you. We want you to go at it like you meant it and let's clean this up and get rid of it.

"Yours truly,
"RKW/SH                    Vice-Pres."

And the defendant replied by telegram on next day, June 23, as follows:

285 Mo.—44

· "Received at 20 A JO 51

"Fy, St. Louis, Mo., June 148P, 23-17.
"Mt. Vernon Car Mfg. Co.,

"Mt. Vernon, Ill.

"Your letter of the twenty-second received. We accept propositions therein, and are ordering cars to be placed for loading immediately with the understanding that you are to order cars to load immediately an equal tonnage of your said scrap to equal the tonnage of bar . iron which we will load.

Hirsch Rolling Mill Co., ··

"425 P. M."

It will be noticed that the letter of June 21, written by the defendant, begins with the expression, "with the object of settling matters between us (notwithstanding the fact that a large proportion of this bar iron has been sold as explained to you on account of the B. & O. inspector's repeated objections)." The plaintiff without a specific acceptance of the proposition made in that letter begins its telegram for acknowledging the receipt of the letter:

"Place the order for cars and start loading at once . . . and we will see that you get an equal tonnage of scrap."

The only inference from the language in that telegram is that there was an intention on the part of the plaintiff to accept the agreement made; but in order to leave no doubt about it the letter written by the plaintiff on the same day, June 22, calls attention to about 500 tons of iron on the defendant's yard that had not been accepted by the B. & O. people, and urges the defendant to load the iron as quickly as possible.

One suggestion made by the defendant in the telegram of June 22nd, where it said it would expect pay for the bar iron before it left its works and would pay for the scrap before it left the plaintiff's works, was . not satisfactory to the plaintiff and the plaintiff in its letter of June 22nd, protesting against the stipulation says: "You told us in your message yesterday that you

would ship what iron the B. & O. people accepted that you now have in your yards, invoicing same at $2.25 per ton if we would ship you an equal tonnage of steel scrap, shearings and punchings at $16 per gross ton f. o. b. St. Louis, and this we have agreed to do."

And further on in the same letter the plaintiff said: "We have accepted your proposition made us by wire yesterday and expect you to carry it out exactly as it reads without any further delay or fooling about it."

On receipt of that letter the next day the defendant, by telegram, receded from its position and accepted the proposition as stated.

Respondent claims the mind of the parties didn't meet upon certain details of the contract. It is asserted that the defendant had in mind that the plaintiff should ship out an additional 500 tons of scrap, whereas the plaintiff had in mind that the 414 tons of scrap already shipped should be counted in the deliveries provided for in the letters. There is no ground for that inference. In the letter of June 21, the defendant proposed to ship at once the iron "re-inspected here at our works a few days ago . . . if you will ship us at the same time in exchange an equal tonnage of steel scrap and shearings," etc. The plaintiff in his reply telegram, June 22, after speaking of the iron added: "And will see that you get equal tonnage of scrap." In the letter of same date the plaintiff said: "And we will cover your shipments of new iron with an equal tonnage of scrap." Therefore there can be no question that the idea in the minds of both parties was that under the new arrangement the defendant was to ship the bar iron which it had manufactured and in its yard, estimated at 500 tons, some of which had been sold and would have to be repurchased, and the plaintiff was to ship an equal tonnage of scrap. The expressions quoted refer solely to future deliveries.

Respondent claims that it never agreed that the cars to carry scrap were to be loaded immediately.

That the bar iron was to be loaded and shipped by the defendant immediately appears all through the correspondence, and the plaintiff was feverishly endeavoring to hurry that operation. The first letter written by the defendant, June 21st, after mentioning the shipping at once of the bar iron, used this expression: "If you will ship us at the same time in exchange an equal tonnage of steel scrap." That was the proposition accepted by the plaintiff because it stated in the letter of June 22nd: "We will see that you get an equal tonnage of scrap." And the letter of June 22nd, after urging the defendant to begin loading bar iron immediately, said: "And we will cover your shipments of new iron with an equal tonnage of scrap." And in the letter of June 22nd, the defendant again suggested that the scrap must be shipped immediately. This, and the letter of June 21st, were before the plaintiff, and on June 22nd it wrote, referring to the proposition, "and this we have agreed to do," stating further in the same letter: "We have accepted your proposition made us by wire yesterday."

There seems to be no room for the conclusion that the minds of the parties failed to meet; every detail of the new arrangement was agreed upon and the parties immediately began to act upon it. The defendant within the next two weeks shipped 117½ tons of bar iron. There was some delay on account of getting cars, but that did not satisfy the plaintiff.

On July 3, the plaintiff wrote a letter in which it complained of the failure of the defendant to "carry out your agreement with us," evidently referring to the agreement last mentioned—the agreement which modified the original contract. The plaintiff had in mind that the contract was modified, for after complaining that it was not the intention of the defendant to carry out "any agreement that you have made with us" it demanded a performance of the "original agreement" and threatened recourse to the courts for failure to carry out the original agreement.

II. It is argued by the respondent that the arrangement in June, 1917, was an attempted accord and satisfaction, and authorities are cited to show that it was not an accord and satisfaction; that is, there was no performance of the alleged substitute agreement so as to amount to a satisfaction. It had none of the elements of an accord and satisfaction. The original agreement between the parties was still unperformed, and the new arrangement in June did not change all the obligations of the old contract; some of its terms were changed and a misunderstanding as to others was cleared up. The parties still were to ship and deliver each to the other the same product which the original contract called for. The change was in the amounts to be delivered and the time of delivery.

*Accord and Satisfaction.*

Parties to an unperformed contract may alter and modify its terms; to determine whether it is modified by a subsequent arrangement the intention of the parties must be ascertained. [13 C. J. 590; Henning v. U. S. Ins. Co., 47 Mo. 1, c. 431; Lanitz v. King, 93 Mo. 513, l. c. 519; Fruit Growers' Assn. v. Zollmann Produce Co., 220 S. W. 911, l. c. 915.] The party suing on such contract must declare upon it as modified.

It has been repeatedly held by each one of the courts of appeals in this State that an agreement made in substitution of an executory contract of prior date, annuls the former contract and is itself a sufficient consideration for a release of its obligations. [Carman v. Harrah, 182 Mo. App. l. c. 376-7; Smith v. Crane, 169 Mo. App. l. c. 708; Welch v. Mischke, 154 Mo. App. l. c. 735; Cannon-Weiner Co. v. Boswell, 117 Mo. App. l. c. 476-7; Mulliken v. Hazeltine, 160 Mo. App. l. c. 13; Pressed Brick Co. v. Barr, 76 Mo. App. l. c. 386; Pottery Co. v. Folckemer, 131 Mo. App. 105.] While the rule is thus stated broadly the substituted arrangement must contain a charge of the obligation of each party in order to constitute a consideration. If the obligation of one party only is

*Consideration.*

affected by the new arrangement, and the other party receives nothing additional and is relieved of no duty, then there is a want of consideration. [Koslosky v. Bloch, 191 Mo. App. 257, 1. c. 260; Zerr v. Klug, 121 Mo. App. 286, l. c. 292; Wilt v. Hammond, 179 Mo. App. 406, 1. c. 414-16.]

In the present case both parties were relieved of the stipulations to deliver the commodities in the times provided for in the first contract. Instead of each being required to furnish the other 1050 tons, the defendant was required to furnish so much of the bar iron as it had already manufactured in its yard, such as the plaintiff required, the total amount in the yard being estimated at 500 tons. The plaintiff was to ship an equal tonnage of scrap, thereby being relieved from shipping the total amount which was provided for in the original contract. The specifications were relaxed so that the defendant was not obliged to meet the requirements of the first contract. Undoubtedly there was a sufficient change of the obligations of both parties to constitute a consideration for the new arrangement. From the evidence in the record there is no doubt but that the new arrangement was accepted and agreed upon in lieu of the former; if as a matter of fact there had been doubt about the facts as to whether the new arrangement was accepted in lieu of the first it would have been a question for the jury. [England v. Houser, 178 Mo. App. 70, 1. c. 75; Zinke v. K. O. T. M., 198 Mo. App. 399; Chouteau v. Jupiter Iron Works, 94 Mo. 1. c. 400; 1 C. J. 583.]

*Jury Question.*

III. The defendant asked an instruction which the court gave, directing the jury to return a verdict for defendant upon its counterclaim for breach by plaintiff of the original contract. The instruction was erroneous on any theory of the case, because the defendant had not declared on that contract in its counterclaim, but had declared on the modified contract. It is now argued by the plaintiff that the defendant there-

*Shifting. Position: Waiver.*

by waived its right to claim any error was committed by the trial court in refusing the defendant's demurrer to the evidence and instructions based upon the plaintiff's cause of action upon the original contract.

It is true that parties in this court are held to the theory upon which they treat a case below. If a party invites error by submitting his case upon a certain theory to the trial court, he will not be heard to question the propriety of that theory upon appeal here. That rule, however, has its limitations. A party may be drawn into error by the attitude of the trial court. If the court disregards or overrules the contention of a party in presenting a correct theory of the case, and forces the issues upon an incorrect theory, the party so coerced by the court does not waive his right to claim here error committed by the court in that respect. A distinction is made in some of the cases between the position of the plaintiff in that respect and the position of defendant, on the grounds that the plaintiff chooses his ground when he brings his suit, while the defendant is brought into court involuntarily and may shift his position to meet the requirements of the court.

It is claimed here that when the defendant filed its counterclaim it was assuming the role of the plaintiff, and as to that cause of action the defendant here was plaintiff. To support the position the appellant cites Everhart v. Bryson, 244 Mo. 507, 1. c. 515 to 518. The opinion in that case, written by FERRISS, J., was by a divided court, WOODSON and KENNISH, JJ., dissenting. It is proper to examine the ground upon which that ruling is placed and the cases cited in support of it to determine whether the principle invoked applies here. The plaintiff there asked a peremptory instruction to find for him, which the court refused, then caused the issues of fact to be submitted to the jury upon instructions which he asked. The court held that he thereby waived his right to say that the court committed error in refusing his peremptory instruction. He chose to submit the issues to the jury and therefore cannot now say that

they were wrongly submitted. That opinion quotes from an opinion in Kenefick-Hammond Company v. Fire Ins. Society, 205 Mo. 294, where LAMM, J., after pointing out that the plaintiff chooses his own ground for the contest, while the defendant must try the case upon the theory selected by the court, quotes the couplet:

> "For he who fights and runs away,
> May live to fight another day;
> But he who is in battle slain,
> Can never rise and fight again."

And then applies the principle in these words:

"He who fights and runs away from a position taken on his answer and at the trial, because *driven* away by the court, may live to fight another day on appeal in the same position, if he marked the spot by an exception; but ho who is in battle slain—that is, who selects his place voluntarily, and who legally (speaking in figure) dies in his tracks on his selected theory, can fight no more on appeal."

In that case the defendant was shifting his ground in response to the demands of the trial court, and it was held he was not estopped to assign error to the action of the court because he had involuntarily yielded to it on the trial. The opinion in the Everhart case also cites the case of Cochran v. People's Railway Co., 113 Mo. 359, opinion by GANTT, J., where the defendant had asked an instruction in accord with the theory upon which the case was submitted to the jury, and it was held that he was not estopped to complain of the action of the court on ruling against his position which had differed from the doctrine of that instruction. Judge GANTT said, l. c. 366:

"It must be remembered that a defendant occupies a different attitude from his adversary, the plaintiff. The plaintiff brings the action. If the ruling is adverse, he may take a nonsuit. Not so with the defendant. He is in court without his consent. The court may make any number of rulings that he may deem erroneous, but he cannot abandon the case; he is in court and must

remain till the cause is finished. He has a right to tender as many defenses as he has. If the court erroneously deny him one, he must avail himself as best he can of those remaining.''

This court had previously held that the right to shift his ground in response to the theory of the court applied to a plaintiff as well as a defendant. [Donnell v. Wright, 147 Mo. 639, l. c. 648.] The court there said:

''It is contended, however, that the plaintiff waived this bar by offering evidence and asking instructions on the issue submitted to the jury. Had he voluntarily done so, this might have been the case, but as he was constrained to this course by the adverse rulings of the court he is not precluded from insisting on the error.''

That case is cited and the passage quoted by Judge LAMM in the Kenefick-Hammond case, without disapproval of the ruling.

The case of Bailey v. Kansas City, 189 Mo. 503, is where the doctrine was applied to a defendant, but the court, after calling attention to the rule that a party participating in an error waives his right to complain that it was erroneous, uses this language, l. c. 513:

''But the reason of the rule ought not to permit its application to a case where the losing party, as here, does not invite the error, but yields under protest to the theory of the trial court and thereafter tries, as best he may, to ameliorate his plight by administering an antidote to the poison already injected in the case, to see if peradventure, he may not be able to render it innocuous.''

It will be noted in that quotation and throughout the case that no distinction is made between the plaintiff and the defendant, but distinction is made between the party who invites error and the party who yields to it on demand of the court. The Kansas City Court of Appeals, applying the rule to a plaintiff, held that he might shift his ground in response to the theory of the court without waiving the right to claim error in the

ruling. [Eagan v. Martin, 81 Mo. App. 676, l. c. 680; also see Bealey v. Blake's Admr., 70 Mo. App. 229, l. c. 237.] These cases are expressly overruled by the opinion in the Everhart case. The rule laid down in the Everhart case seems to the writer to be extremely harsh, and not promotive of justice. It requires a plaintiff, where the court differs from him in the theory of his case, after his evidence is in, to elect at once whether he will stand by his own theory or adopt that of the court. Either course would preclude him from ever selecting the other. If he surrender his convictions and the court proves to be wrong, he is powerless to set it right. If he takes a nonsuit and begins over again he faces the same alternative that confronted him the first time. [See also Dietz v. Nix, 202 Mo. App. l. c. 648.]

But the present case on the issues presented is clearly distinguishable from the Everhart case. The defendant in filing his counterclaim was not in the position of a plaintiff who chooses his ground of action; he was like any other defendant; his counterclaim is one which arises "out of the contract or transaction set forth in the petition as the foundation of the plaintiff's claim." [Sec 1807, R. S. 1909.] The defendant could not dismiss his counterclaim on the adverse ruling of a trial court and bring it over again, because an adverse judgment on the plaintiff's cause of action would be *res adjudicata* as to the binding obligation of the contract sued on in the petition. It would be conclusive that the only rights the defendant had would be upon that. The defendant could not survive in its couterclaim "to fight another day," in the language of Judge LAMM. It must stand or fall in the present case; whatever remedy is available to it on its counterclaim must avail it now or never.

The defendant did the best it could, basing its cause of action on its counterclaim squarely upon the substituted contract of June 22, 1917. All the way through the trial it protested that such was the contract, and the only contract in existence between the parties; it insisted from start to finish, and submitted instructions upon, that

theory both as to the plaintiff's cause of action and as to the defendant's cause of action. The court refused all those instructions. The defendant then had no recourse or defense against the claim of the plaintiff, except the mitigation of its counterclaim. It didn't voluntarily choose that position; it was driven to it after it had chosen other ground. Consideration of the cases cited above will show that emphasis is placed upon the voluntary choice of ground by a party who is held to waive his right to complain of error.

The defendant did not waive its right to claim here that the theory of the trial court, holding the original contract to be still in force, was erroneous.

IV. The appellant urges this court to reverse the judgment so far as it affects the recovery by the plaintiff, but to leave the judgment stand as to the verdict in favor of the defendant on its counterclaim, because there was no appeal by defendant from it, although it was erroneously ordered. That there can be only one final judgment which must determine all the issues as to all the parties, is conceded to be the rule. [McQuitty v. Steckdaub, 190 S. W. l. c. 591; Clark v. Railroad, 234 Mo. l. c. 435; Crow v. Williams, 104 Mo. App. l. c. 454; Connelly v. Railroad, 169 Mo. App. l. c. 281; Morton v. S. W. Tel. & Tel. Co., 280 Mo. 360, 217 S. W. l. c. 833; State v. Jump, 198 S. W. l. c. 432; Wollman v. Loewen, 96 Mo. App. 299.]

It is pointed out in some of those cases that a judgment may be reversed as to some of the parties and affirmed as to others; that a reversal may be ordered as to some parties to a judgment, and a verdict as to other held in abeyance until a final determination of all issues as to the other parties. The appellant calls attention to Section 1878, Revised Statutes 1909, providing that an action on a counterclaim is an independent action, distinct from the cause of action alleged by plaintiff in his petition, and is to be tried as a separate suit, and contends that the verdict on its counterclaim must stand

because it is not appealed from, although the judgment in favor of the plaintiff may be reversed on account of error.

The trouble with that position is that there are not two separate judgments in this case; the trial court entered no judgment in favor of the defendant on its counterclaim. In a single verdict which the jury rendered they assessed damages of the plaintiff at $27,060, and assessed damages of the defendant upon its counterclaim at $12,720. The trial court then did not enter a judgment in favor of the plaintiff for the amount of damages assessed, nor in favor of the defendants for the amount of damages assessed defendant; whether it should or could have done so under the statute we need not inquire. The judgment is as follows:

"Wherefore, it is considered and adjudged by the court that the plaintiff have and recover of and from the defendant the difference between the damages assessed in favor of the plaintiff on its cause of action and the damages assessed in favor of the defendant on its counterclaim, to-wit, the sum of $14,340, together with the costs of suit, and have execution therefor."

There is no judgment here except the judgment for the plaintiff; it is the only judgment with which we have to deal.

Accordingly, the judgment is reversed and the cause remanded. *Railey* and *Mozley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by White, C., is adopted as the opinion of the court. All of the judges concur.