John M. DICKEY et al.,
Plaintiff-Appellants,

v.

Rudy JOHNSON et al.,
Defendant-Respondents.

Nos. KCD 26923, KCD 26925, KCD 26926 and KCD 27238.

Missouri Court of Appeals,
Kansas City District.

Dec. 8, 1975.

Motion for Rehearing and/or Transfer
Denied Jan. 12, 1976.
Application to Transfer Denied
March 8, 1976.

John R. Cleary, Kansas City, for appellant John M. Dickey; Linde, Thomson, Fairchild, Langworthy & Kohn, Kansas City, of counsel.

Theodore C. Beckett and Jack K. McDonald, Kansas City, for appellant William C. Hines; Morris, Foust, Beckett & Ponick, Kansas City, of counsel.

Harry A. Morris and Donald H. Loudon, Kansas City, for appellant Cecil Van Tuyl; Morris, Mitchell, Larson, King, Stamper & Bold, Kansas City, of counsel.

Emmett Bartram, Maryville, and Richard F. Adams, Kansas City, for appellant Edward Appleton; Slagle & Bernard, Kansas City, of counsel.

Robert Devoy, Brookfield, and Donald L. Shughart, Kansas City, for appellant Robert S. Dorsey; Shughart, Thomson & Kilroy, Kansas City, of counsel.

Richard F. Adams, Kansas City, for appellant Henry Salisbury; Slagle & Bernard, Kansas City, of counsel.

Miller & O'Laughlin, P. C., George T. O'Laughlin, Kansas City, for respondents Rudy Johnson, Citizens Bank of Hopkins, Citizens Bank of Newtown, Citizens Bank of Craig, Citizens Bank of Otterville, Thirty-Three Venturers, Inc., Thirty-Four Venturers, Inc., Thirty-Five Venturers, Inc., Thirty-Six Venturers, Inc., Thirty-Seven Venturers, Inc., and Rosemary Johnson; Larry E. Butcher, Kansas City, of counsel.

William H. Leedy, Daniel M. Dibble and Gary S. Dyer, Kansas City, for respondents Citizens Bank of Brookfield and Columbia Union Nat. Bank and Trust Co; Lathrop, Loontz, Righter, Clagett, Parker & Norquist, Kansas City, of counsel.

Before PRITCHARD, C. J., and SHANGLER and SWOFFORD, JJ.

PRITCHARD, Chief Judge.

Appellants had judgment against them on their suit for specific performance of a claimed settlement agreement of disputes arising out of previous contracts for the sale of five rural banks in north Missouri to respondents, Rudy Johnson and his wholly owned, one-bank holding companies, the Venturers corporations. Judgment was also rendered against appellants on certain of respondents' counterclaims based upon an alleged conspiracy of appellants to render unto respondents financial duress which

resulted in damage occasioned by the forced sale of the Security (later Citizens) Bank of Brookfield, Brookfield, Missouri, for an amount claimed to be less than it was worth; and (2) wrongful interference with an escrow holding of bank stock in the Columbia Union National Bank.

Thirty-Seven Venturers, Inc., was the owner of the Brookfield Bank, and judgment was entered for it against appellants Dickey, Hines, Appleton, Dorsey and Van Tuyl, jointly and severally, in the amount of $218,333.33, as damages under Count VII for the claimed conspiracy; $1.00 nominal damages to respondent Johnson, and a total of $125,000.00 punitive damages, awarded to the various Venturer corporations and to Johnson against the above-named appellants under Counts VI and VII of the amended counterclaims. Thirty-Three, Thirty-Four, Thirty-Five and Thirty-Six Venturers, Inc., were awarded judgment against the foregoing appellants jointly and severally in the amount of $19,714.33, and Johnson was given judgment for $1.00 under Count VI of the counterclaim, which was for the alleged interference with the Columbia Union escrow. The initial judgment was against appellant Salisbury also, but he was later relieved of it by the court upon its finding that he was a mere "go along" party to the claimed conspiracy. Count V of the counterclaim was brought by Thirty-Five Venturers, Inc., against Hines, Appleton, Dorsey and Salisbury, for reimbursement of losses, expenses and attorney fees incurred because of alleged misrepresentations, breach of warranty and nonfulfillment of the original October 16, 1970, contracts for the sale of the Harris Banking Company (later Citizens Bank of Newtown), pursuant to an indemnity agreement in the original contract. A separate trial of the issues of Count V was ordered by the court, and those issues are not involved in this appeal.

■ Respondents' motions to dismiss the appeals of Dickey, Van Tuyl, Dorsey, Hines and Appleton, because of deficiencies in the statements of facts and in points relied on, are overruled, although there is some merit in the motions. The issues and facts ascertainable from all the briefs and the reading of the voluminous transcript (over 2,400 pages), enables this court to resolve this appeal.

Early in 1970, the six appellants owned shares of stock in the five banks as follows: Hines: 78⅞ shares in the Bank of Craig, 65 shares in the Bank of Otterville, 163¹²/₁₆ shares of Harris Banking Company, 252 shares of Hopkins State Bank, and 1,487½ shares in the Citizens Bank of Brookfield; Appleton: 78 shares of Craig, 5 shares of Harris, and 24 shares of Hopkins; Dorsey: 1,197 shares of the Security Bank of Brookfield, 65 shares of Otterville, and 34⁷/₁₆ shares of Harris; Dickey: 118 shares of Hopkins; Salisbury: 5 shares of Harris; and Van Tuyl, 469 shares of Brookfield. These banks were insured by F.D.I.C., with the exception of Craig, which was a member of the Federal Reserve System. All were subject to the regulatory authority of the Commissioner of Finance of Missouri. The F.D.I.C. conducted examinations of the four banks subject to its jurisdiction in 1969 and early 1970, and shortly thereafter issued its "Findings of Unsafe and Unsound Practices and Order of Correction." The Commissioner of Finance criticized the *five* banks for the same reasons as the F.D.I.C., which, in general, were: "Pursuit by the bank of reckless credit, lending, and collection policies and practices including but not limited to: (a) the carrying of an excessive volume of loans subject to adverse classification; (b) the carrying of an excessive volume of overdue loans; (c) the carrying of weak and self-serving loans to directors, officers, their associates and related interests; (d) the carrying of an excessive volume of weak and unsupported loans to out-of-territory borrowers; (e) the indiscriminate participation in large, weak, and undocumented loans originated by related banks; (f) the carrying of an excessive volume of loans without adequate credit information; (g) the unwarranted practice of

extending credit in the form of cash items." The F.D.I.C. then issued its "Order Setting Hearing on Termination of Insured Status" for September, 1970, and counsel for the banks, Messrs. Harry Morris and James Veselich, procured a continuance of the hearing to October 20, 1970, on which date those counsel appeared. As a result of that hearing, a "Memorandum of Agreement" was made with F.D.I.C. with respect to each of the four banks it insured. These agreements are referred to in the record as "the F.D.I.C. commitments", and by paragraph 7 thereof that two provisions would be included in any contracts of sale of the banks entered into subsequent to October 20, 1970, that (a) sellers agree to collect for the benefit of the bank(s) or purchase at book value the loans or extensions of credit to John and Alan Dickey, George E. Owens, William Bowman, Jr., Sarann Auto Leasing, Inc., and Sarann Truck Rental, Inc., and John Molle (all if not sooner collected) within 180 days after the date of closing; and (b) the same provision as to overdrafts to Edward C. Appleton, O.H.A. Farms, Inc., and Parkdale Estates, Inc. There was a provision that if sellers picked up the defaulted receivables they would be endorsed over to them without recourse.

On October 16, 1970, five practically identical contracts of sale "as a package deal" were entered into by the (above) shareholders of the five banks with Johnson and his five Venturers corporations. The price to be paid for the banks was set at 185.2% of the book value of the banks as of June 30, 1970, and "book value" was defined to mean "the aggregate capital, surplus, and undivided profits." The sellers warranted in the October 16, 1970, agreement that the book value of the banks was not less than $1,100,000, and according to Johnson's counsel, Ernest Fleischer, that figure came from sellers, and Dorsey told him that there was a substantial cushion in that, because there were earnings in the "Brookfield Bank which are earned during the year but not booked until the first of the following year, and he said he felt very comfortable, that

the million-one-hundred-thousand-dollar figure was good." By paragraph 4 of the agreements it was provided (generally) that as to receivables due the banks which were classified as "doubtful, loss or in a similar category" as of the date of closing by any regulatory authority, notice would be given by buyers to sellers, who then would have 180 days to cure the defaults, but if unable to cure the default or remove the classification, buyer would have the right to reduce the principal balance(s) of any promissory notes given to sellers for the balance of the purchase price of the banks by 185.2% of the principal and interest of the defaulted receivables. The purchase price of the banks (in the aggregate) was determined to be $2,000,000, which was 185.2% of the warranted book values. $700.000 was to be paid to sellers in cash, and $1,300,000 was to be paid by buyers' promissory notes. The notes and cash were, upon closing, allocated proportionately to sellers in accordance with the then proportionate stockholdings in the respective banks. Venturers procured their cash payment by loan from the Columbia Union National Bank and affiliates, pledging capital stock of the five banks in an escrow agreement, and it was necessary for Johnson to put up certain collateral unrelated to the banks he was buying: his controlling interest in Mid-America Bancorp, Inc., a one-bank holding company of controlling interest in the Smithville bank, valued at one million dollars; life insurance policies, and his wife's guarantee.

The F.D.I.C. commitments referred to above were incorporated into supplements to the October 16, 1970, contracts on November 27, 1970 by a new paragraph 29 (Supplement No. 2), and by paragraph 7 of the supplement it was provided, " 'In the event sellers are in default under this paragraph 29, Buyer may reduce the principal balance of any promissory notes issued to sellers under this Agreement, or any other agreements referred to in paragraph 26 hereof, in an amount equal to (1) 185.2% of the unpaid principal balance and the inter-

est due on such receivable at the date of such reduction, and (2) interest on the amount computed under (1) above at the rate of 7% per annum, from Closing to the date of such reduction.'"

The obligations mentioned in the F.D.I.C. commitments which were incorporated in the contracts for sale of the banks were these: Hopkins Bank: John Dickey $30,240.00, George Owens $30,240.00, William Bowman $14,112.00, O.H.A. Farms $3,433.64, a total of $90,604.45 due Hopkins; Craig: John Dickey $25,155.66, George Owens $25,373.43, William Bowman $25,222.20, Sarann Truck Rental $4,360.12, Edward Appleton $223.57, O.H.A. Farms $3,412.64, Parkdale Estates $26,439.64, a total of $110,186.76 due Craig; Harris (Newtown): John Dickey $20,137.78, George Owens $20,261.96, Sarann Auto Leasing $3,114.78, Sarann Truck Rental $6,532.72, John Molle $304.80, Parkdale Estates $21,097.78, a total of $71,449.82 due Harris (Newtown); Otterville: John Dickey $17,636.00, George Owens $17,748.89, William Bowman $17,640.00, Parkdale Estates $957.16, a total of $53,982.05 due Otterville; Brookfield: John Dickey $88,182.22, Alan Dickey $30,240.00, George Owens $77,458.88, William Bowman 114,396.89, Parkdale Estates $121,566.71, a total of $431,884.70 due Brookfield. The total owed by these debtors, whose debts sellers agreed to pay to the various banks, was $758,067.78, broken down as follows: Dickey $181,351.66, Alan Dickey $30,240.00, George Owens $171,083.18, William Bowman $171,371.09, Sarann Auto Leasing $3,114.78, Sarann Truck Rental $10,892.84, John Molle $304.80, Edward Appleton $223.57, O.H.A. Farms $7,802.94, and Parkdale Estates $181,682.94. Many of these obligations were "participated out" to the various banks because of capital limitations upon loans.

A short time after closing of the contracts of sale, Johnson ascertained that over $2,000,000 of the loans in the banks would not be timely paid. He had been making extensive efforts to collect on delinquent loans. On January 31, 1971, and also on February 25, 1971, the delinquent loans (including those listed above as contained in the F.D.I.C. commitments) totalled $2,660,882.00. (It appears from the evidence that this figure included $144,791.97 in notes which had been charged off at the Brookfield bank prior to October 16, 1970). On the latter date, Johnson, for his Venturers corporations, notified sellers by letter (as provided in the contracts of sale) directed to their counsel, Mr. Harry Morris, that unless the obligations were paid within 180 days, Johnson and the Venturers corporations would exercise the rights to reduce the $1,300,000 notes in accordance with paragraph 4 of the contracts (185.2% of the outstanding, unpaid and delinquent obligations).

On February 18, 1971, the Morris firm wrote Hines and Dorsey concerning a phone conference had with Ernie Fleischer relative to the position of John Stathos of the F.D.I.C., who "made it absolutely clear that the F.D.I.C. would not sanction any arrangement whereby you or any of the other sellers or any associates of any sellers could default on any obligations to any of the subject banks and just allow Rudy to write the particular obligation off against the notes which he carried back on the sale of the bank stock. Obviously, Rudy would prefer in many instances to just write these obligations off from the notes which he carried back at the multiplier (1.85) and then pump whatever additional capital is needed into the various banks on a dollar for dollar basis. John Stathos' position on this particular matter, I think, is very advantageous to you and the other sellers and I thought you would be interested in seeing someone put Rudy's feet to the fire."

On March 3, 1971, Dickey was notified by Johnson's counsel advising that his $100,000 note to Hopkins, and his $80,000 note to Brookfield had been handed to the firm for collection with a request to commence suit unless they were promptly paid. [Apparently these loans were participated to the other banks in the amounts above noted as

Dickey's personal obligations.] Dickey responded that he had been trying to assist in seeing the notes were paid by May 28, and that an impending sale and refinancing of property would provide funds for payment in full. About this time, according to Johnson, the timely failure to pay the F.D.I.C. commitments necessitated his generating additional borrowings to replenish the capital of the banks: "Any time a loan is not paid, particularly substantial loans, such as the former principals had, or the sellers had, it then impairs the capital of the bank, and as a result, the regulatory people then insist that those loans be put back into the bank." Also, according to Johnson, the results of an audit by Peat, Marwick & Mitchell on December 31, 1970, the book value of the banks was in the vicinity of $700,000 instead of the warranted $1,100,000.

On February 24, 1971, Hines wrote attorney Morris that "apparently we have run into much more difficulty than either of us anticipated in getting Rudy Johnson and his attorney Ernest Fleischer under control; * * *. As we both have come to realize, we are dealing with two of the fastest drawing characters in the west and in order to make everyone happy in the selling group, I would appreciate, very much, your engaging your close friend and mine, Albert Thomson, to assist us in getting this ship righted." To this, Morris responded that he agreed wholeheartedly with Hines' conclusion that Thomson "should be brought into the fast developing controversy as quickly as possible." On March 4, 1971, Thomson wrote to Hines and Dickey advising as to problems with the sale of their bank stock, the first of which "is the claimed 'double payment' interpretation urged by Johnson", and paragraph 29 of Supplement No. 2 providing "the Sellers agree to collect for the benefit of the bank or purchase 'extensions of credit to John and Alan Dickey, George E. Owens, William Bowman, Jr., Sarann Auto Leasing, Inc., Sarann Truck Rental, Inc., John Molle, Edward C. Appleton overdraft, O.H.A. Farms, Inc. overdraft and Parkdale Estates, Inc. overdraft.' " (Quote

and emphasis from Thomson's letter.) Hines and Dickey were further advised that the bank could sue sellers and possibly collect as third party beneficiaries, meaning that any solvent seller could be forced to pay all such obligations and then that seller would have to collect from his co-sellers or the persons obligated to the bank, and "This is a real problem and I feel we must know the situation of these Sellers so we can appraise the real danger. What are the facts?" And "In this matter, our firm represents only you two gentlemen, since a conflict may arise with the other Sellers." Thomson then stated that he could not over-emphasize the danger of their position; that they agreed to pay obligations according to figures in the February 25th letter: Owens, $170,818; Bowman, $170,000; Parkdale Estates, $180,000; Misc. $24,000, Dickey, $180,000.

On March 23, 1971, Thomson wrote Morris stating Stinson, Mag's (Fleischer's) interpretations of the many documents, that (1) the banks can collect from the sellers and the makers of the notes and also reduce the purchase money note by 185.2%; (2) Section 26 of the Agreement makes all sellers liable on all the notes specified in the Agreement; and (3) neither the June 30, 1970, statement, nor any other statement, governs what notes can be charged under Section 4.

Then, on April 13, 1971, Thomson wrote Morris, Dickey and Hines: "Due to the position that Johnson has taken in regard to the Agreements for the Sale of Stock, as amended, there is no chance of obtaining any part of the balance of the purchase price without expensive and long litigation. Johnson fears only one thing—a failure by Dickey, Bowman and Owens to pay the balances due the banks. Therefore, we must sue and hold up these payments knowing the risk of the bank's failure and the fact that counterclaims can be interposed in these actions against John. Enclosed is a draft of a petition, * * *." Morris replied by letter to Thomson, with copies to Dickey, Hines, and blind copies to Van Tuyl

and Dorsey, that he agreed only in one respect, "namely that suit should be filed as Johnson has breached the contract. I do not agree with you, however, that Dickey, Bowman and Owens should not pay the balances due by them to the various banks. This constitutes a direct breach of the contract and places them and all the other sellers in the same position as Johnson; namely that of breaching the contract. In my opinion all of the sellers would be in a much stronger position in the law suit if Dickey, Bowman and Owens paid as they promised. * * *." Morris' opinion was reiterated in a letter of April 15, 1971, to Thomson, with copies to Dickey and Hines.

On April 30, 1971, Dickey as sole plaintiff sued the five Venturers corporations for declaratory judgment of the agreement of October 16, 1970, with the supplements thereto in various counts. Under Count I, it was alleged that there was a dispute between Thirty-Three Venturers, Inc., as to whether it owed Dickey interest on the note given for the balance of the purchase price of the Hopkins bank, which interest had been paid on March 31, 1971 "under protest." The prayer of Count I was that it be declared that the quarterly interest installments were due and payable. [The evidence shows that Johnson did pay these amounts of interest on his purchase price note: April 14, 1971, $9,999.59; July 1, 1971, $12,911.81; and September 30, 1971, $8,901.85. There is no issue presented as to the correctness of amounts of these interest payments. By letter of April 14, 1971, Johnson enclosed the first interest payment, stating his disagreement with Morris that the interest could not be properly held, "but the payment is being made to avoid all question." Johnson stated his position that the interest payments were not due because the book value of the bank's stock was not as warranted, and that as soon as the amount of the book value which was less than the amount represented could be determined, Johnson expected the interest payment to be returned along with interest paid on December 31, 1970.] Count II of

the declaratory judgment suit alleged a dispute as to whether Johnson (Thirty-Three Venturers) could deduct at the 185.2% rate from the purchase price note of Hopkins notes which were not actual "receivables" upon the allegation that defendant on February 25, 1971, notified Dickey that it intended to deduct from the balance of the purchase price 185.2% of many notes which either were not owned by the bank at the time of closing or which had been charged off at that time. [The February 25, 1971, notice merely advised that the receivables listed on the attached schedule were in default December 31, 1970, and continued so until January 31, 1971, and that if the default(s) were not cured within 180 days, Thirty-Three Venturers would reduce the principal balance of certain notes as per Section 4 (of the sale contract). The notice further set forth, "To assist you further we have attempted to give outstanding balances as of the date indicated with regard to the listed receivables. Upon reasonable request, we will be happy to furnish further information concerning such receivables." The notice did not set forth that Johnson intended to deduct from the purchase notes anything which had been charged off or which were not receivables.] Count III of the declaratory judgment suit alleged a dispute as to whether the 185.2% "charge back" of unpaid loans, per paragraph 29 of Supplement No. 2 of the agreement (the F.D.I.C. commitments above set forth), if exercised, would also discharge the obligor's (Dickey's) notes to the Hopkins bank, a position taken by Dickey and his counsel, Thomson. [This count will be discussed below.] Count IV alleged a dispute concerning paragraph 26 of the five bank stock sale agreements, as to whether all the sellers of the stock in the individual banks were liable for the delinquent loans (the F.D.I.C. commitments) in other banks in which they had held no stock. [This count will be discussed below.] Count V alleged that defendants, Venturers corporations, had not exercised reasonable diligence to collect notes which they claimed (in the February 25, 1971 no-

tice) to be in default, and that those notes "if in default, at all, are only in default.in a technical sense and that the makers of those notes can and will pay the notes. The plaintiff prays for a determination that the Court determine what notes these defendants may call in default and thus reduce by 185.2% the balance of the purchase price due to the plaintiff." [This count ignores the established fact, well known to Dickey and the other sellers, that the obligations under the F.D.I.C. commitments, supra, were in default and up through August 25, 1971, totalled $758,067.78 (not including any previously "charged off" notes by the banks), which multiplied by the 185.2% factor, totals $1,403,941.50, which is more than the $1,300,000 purchase notes given by the Venturers corporations, which thus by application of the contractual "charge back" provision would have been extinguished.] Upon being brought in by the Venturers corporations as counterclaim defendants in the declaratory judgment suit, the counterclaims being upon the obligations to take up the notes under the October 16, 1970, agreement, Van Tuyl, Dorsey, Appleton, Salisbury and Hines denied their liability.

In July 1971, Fleischer had a conference with Thomson after which he asked Thomson, " 'When are your clients going to pay those notes, Al?' And he said, 'We're going to keep the financial pressure on Mr. Johnson until he's ready to compromise.' "

After August 25, 1971, Fleischer notified Morris that no amount remained owing by buyers to sellers on the purchase notes. Prior to that time, one of the lenders to Johnson advised Fleischer in May or June that it had become agitated with respect to the security which the Columbia Union bank was holding and advised Fleischer that he was going to ask the other lenders (participants) to call the loan. In the Spring of 1971, Johnson did raise an additional $200,000 by selling a note of the Venturers corporations and an equity interest to a private individual. In the early Fall of 1971, William Leedy, counsel for the Columbia Union, advised Fleischer that the bank was not interested in renewing the loan or continuing to serve as escrow agent, and that he would appreciate Johnson looking around for a new loan. By that time Johnson was unable to raise additional funds and an attempt was made to sell the Brookfield bank, as suggested by Fleischer as the "only way out." Fleischer learned from Leedy that either he or one of his clients would be interested in buying the bank at the right price.

From July, 1971, to December, 1971, pressures from F.D.I.C. and the State Bank Commissioner increased, with threats from those regulatory authorities to close all the banks unless the capital was restored by payment or removal of delinquent, classified loans. Thomson testified that Johnson would be hurt financially or materially by the failure of Dickey and others to make payments on the notes; that in a general way he was aware that the financial condition of the banks were not too good; and that the F.D.I.C. and the Commissioner were both insisting that a part of the capital be put in the banks by the payment of the notes. Morris testified that during the period after the February 25, 1971, notice he came to understand that Johnson was being financially squeezed because of nonpayment of the matters. Johnson called him about it. Morris knew about the financial squeeze from other sources, testifying, "None of my clients participated in it. Contrarily, they tried to alleviate it." Dorsey denied that he told Hines that " 'delay will hurt him, Rudy Johnson, not us,' " but acknowledged that he probably talked to his attorneys about it. As noted below, defendant's Exhibit HH, which was rejected as evidence by the trial court, but which could properly have been considered by it, revealed that Dorsey and Hines knew on March 12, 1971, the effect of holding up payment of obligations under the F.D.I.C. commitments upon Johnson and his Venturers corporations.

On November 10, 1971, Thirty-Seven Venturers by Johnson circulated invitations

to bid for the sale of the Brookfield bank at a minimum price of 1.5 times book value. About the 1st of December, 1971, Johnson met with Thomson to discuss the terms upon which appellants and other principals would pay their obligations in connection with the proposed sale of the Brookfield bank. At this meeting Thomson was advised that the bank regulatory authorities had given Johnson until December 31, 1971, to restore necessary capital to the banks and it was imperative that the payment deadline be met by the end of the month by appellants. This meeting culminated in the drafting and execution of the contract of December 15, 1971, which is the subject of appellants' suit for specific performance. This contract recites that it is "to settle all differences" between the five Venturers corporations, the five banks, and Appleton, Salisbury, Hines, Dorsey, Van Tuyl, and Dickey, who with others were sellers of the stock of the banks under the October 16, 1970, agreements as amended and supplemented. Hines, Dorsey and Van Tuyl agreed to release from any claim of lien to the Brookfield bank stock so it might be sold (and did so on December 10, 1971); Venturers, Johnson, Appleton, Salisbury, Hines, Dorsey, Van Tuyl and Dickey released each other from all claims, obligations and liens in connection with the October 16, 1970 agreements as amended and supplemented, and agreed to dismiss all pending actions with prejudice. Attached to the contract was Exhibit A listing notes due by Dickey to the Hopkins bank for $92,500.00, and by George E. Owens to that bank of $92,500.00. Under the December 15th agreement these notes were to be paid by December 31, 1971. These notes were "participated" to the Brookfield bank, in the amounts of $7,500.00 and $72,500.00 respectively. Exhibit B attached to the agreement listed these obligations: Dickey, to the Hopkins bank, $7,500,00; Dickey, to the Brookfield bank, $80,000.00; William Bowman, to the Hopkins bank, $70,000.00; George E. Owens, to the Hopkins bank, $72,500.00; and Parkdale Estates, Inc.,

overdraft due the Hopkins bank, $9,704.58. Exhibit B obligations were to be paid on or before January 15, 1972. There was evidence that these obligations were the same as those listed in the F.D.I.C. commitments, and some of them were paid on December 31, 1971 and January, 1972.

Venturers were to receive their notes marked as paid which were issued by them under the October 16, 1970 agreement ($1,300,000), and were to pay $95,000,000 in cash and issue their note to sellers jointly for $255,000.00 which was to be secured by a second lien on all the stock in the remaining four banks: Craig, Hopkins, Newtown and Otterville.

The total of funds due under Exhibit A were sent by Dickey from Florida to Kansas City on December 31, 1971, but did not arrive there until January 3, 1972. Some of the funds due under Exhibit B were subsequently provided by Hines, and all of the funds were credited to the respective banks in discharge of the specified obligations in the exhibits.

■ Appellants point to the issues raised by the April 30, 1971, declaratory judgment suit to support their claim that genuine disputes existed with respect to the October 16, 1970 agreement, as amended and supplemented, which could give use to a valid settlement agreement supported by sufficient consideration. The bracketed comments following discussion of the declaratory judgment suit show that no real disputes existed with respect to Counts I, II and V. With respect to Count III, it is factitious for Dickey to claim that the 185.2% "charge back" provision (against the Venturers purchase money notes upon default of the contractual provision that sellers would pay off or pick up their F.D.I.C. commitment loans and guaranties), would discharge his note to the bank. The obligations of Dickey and others were to the individual banks. Clearly, the right of one corporation to reduce its obligation by application of the charge-back provision, would not affect the debt owed by the other party to a separate corpora-

tion. Nonpayment, or failure timely to pay those past due obligations clearly impaired the capital structure of the banks, thus reducing the *book value* of 185.2% paid by Johnson and his Venturers corporations. The "charge back" provision of the contracts of sale was clearly for the benefit of buyers. Dickey and his counsel, Thomson, conceded at trial that timely payment of Dickey's $100,000 obligation for which he received full value when borrowed, to the Hopkins bank would have prevented any 185.2% charge back on the purchase money note given him by Thirty-Three Venturers, Inc. By application of the charge back percentage, that corporation was reimbursed by the same premium it had paid for the stock, occasioned by the non-collectability of obligations within the time specified in the October 16, 1970 agreement. The sale contracts mention no other effect of the exercise of the charge back right. Clearly, no real, genuine issue existed under Count III.

■ In Count IV of the declaratory judgment suit, appellants claim that a dispute existed with respect to sellers "joint and several" liability under paragraph 26 of the identical agreements for sale of the banks. That provision references the other agreements and recites, "In recognition of the fact that Buyer and its affiliates desire to purchase the stock of all, but not less than all, of the five (5) banks, and to induce Buyer and its affiliates to execute this agreement and the four other agreements, it is understood and agreed that default by any of the sellers in any of the other four (4) agreements with respect to any of the representations, warranties, covenants or agreements therein made, or thereunder to be performed, shall give to Buyer the right, but not the obligation, to cancel or take the same action under this Agreement, *and the promissory notes issued hereunder, as the Buyer in such defaulted agreement shall be entitled to take under such defaulted agreement, or the promissory notes issued thereunder, to the same extent as if this Agreement and the defaulted agreement were*

*one and the same, and with the same effect as if the promissory notes issued hereunder had been issued under such defaulted agreement."* (Italics added.) As noted the sale of the five banks was a "package deal" and the first part of paragraph 26 has reference to buyers' right to back out of the sale of all banks if the sale of one or more of them failed to go through. The above italicized portion certainly obligated all the sellers to see that the notes (the F.D.I.C. commitments) were paid to the respective banks or suffer the 185.2% charge back provision upon the individual notes given them by the various Venturers corporations or this package deal. As noted above, all five banks were in serious trouble with the regulatory authorities, and all sellers, prior to the contracts of sale, were subject to the possibility, if not the probability, that all five banks would be closed and all or a good part of their capital investments would be lost. The contracts for sale, if fully performed, gave sellers the opportunity to avoid their collective losses, hence the inclusion of paragraph 26. Also, as the facts above show, through participation certificates, Dickey owed money to all five banks, a total of $181,351.66; George Owens owed money to all the banks, a total of $171,-083.16; William Bowman owed money to all the banks except Harris (Newtown), a total of $171,371.09; Parkdale Estates owed money to all the banks except Otterville, a total of $181,682.94. These obligations alone, at 185.2% charge back, would exceed Venturers $1,300,000 notes. So it is seen that even on a basis of individual bank stock holdings in the separate banks sold, the obligations to see that the F.D.I.C. commitments were paid were interrelated among all sellers. Note also the letter of Thomson to Hines and Dickey advising them that under paragraph 29 of Supplement No. 2 of the bank sales, "The Bank could sue the Sellers and possibly collect as third party beneficiaries on these credit extensions and overdrafts. This would mean that any solvent Seller could be forced to pay all of such obligations and then that

Seller would have to collect from his co-sellers or the persons obligated to the Bank."

■ Appellants assert that the December 15, 1971, agreement was a valid compromise and settlement of pre-existing disputes between them, Johnson and the Venturers corporations. The cases they cite do say generally that good faith claims or disputes may be compromised and validly settled. The rule was stated in the case of *Reilly v. Chouquette*, 18 Mo. 220, 226 (1853), "When a right is disputed and a compromise ensues, that compromise will not be disturbed, should it turn out afterwards that one of the parties had no right in law. Such a principle would overthrow all compromises. The compromise, of a doubtful claim is a good consideration for a contract." *Weirsert v. Bramman*, 216 S.W.2d 430, 434 (Mo. 1948), stated the rule but added, "If a claim is asserted in good faith, the merits of the controversy will not be considered after the parties have agreed upon a compromise." In *Charles F. Curry and Company v. Hedrick*, 378 S.W.2d 522, 533 (Mo.1964), the court stated that a dispute existed in the circumstances involved. The "good faith" requirement of the dispute which may be validly compromised and settled is set forth in other authority and cases. In 15A C.J.S. Compromise and Settlement § 11d., p. 210, it is stated, "A claim as to which the doubt or dispute arises must be asserted honestly and in good faith. The party asserting the claim must have a reasonable belief in his ability to sustain it, although such belief may be due to an honest mistake. As otherwise stated, only those disputed claims honestly and in good faith asserted, concerning which the parties may bona fide and reasonably disagree, will support a compromise. A person asserting a claim without any ground whatever on which to base it cannot be said to have acted in good faith * * *." The case of *Heck v. Watkins*, 183 S.W. 351 (Mo.App.1916), and its discussion of cases at page 354, is illustrative of the good faith requirement of a claimed dispute and at page 355 it was said, "Not going to the extent of the rule announced in *Long et al. v. Towl*, supra [42 Mo. 545 (1868)], and applying the rule referred to by our court in *Osborne v. Fridrich*, supra [134 Mo.App. 449, 114 S.W. 1045 (Mo.App.1908)], as to the element of good faith on the part of the plaintiff in making a claim under this bond for a deed, it is to be borne in mind that 'good faith,' to enter in as an element, must have some tenable ground to stand on. It is not to be predicated upon an unreasonable, groundless, dogmatic assertion of a right." (Bracketed citations added.) The *Osborne* case called attention to the fact that the element of good faith in asserting a demand in suit which is settled and relied on as a consideration for a new promise, plays an important part in the validity of the consideration, and it " 'ought to be the true criterion of validity.' " (*Heck,* supra, loc. cit. 183 S.W. 354.) See also the cases of *Deiss v. Kasselmann*, 189 S.W. 824, 825 (Mo.App.1916); *Yansey v. Central Mut. Ins. Assn.*, 77 S.W.2d 149, 154[5] (Mo.App.1934); *Tegethoff v. Sidmon*, 158 S.W.2d 224, 228[3] (Mo.App.1942); *Duncan v. Black*, 324 S.W.2d 483, 486 (Mo.App. 1959); and note the case of *Morris v. Reed*, 510 S.W.2d 234, 242 (Mo.App.1974), in connection with the claim here made that the December 15, 1971, agreement recited that "it was to settle all differences", where it was said, "However, mere recitals of this type in a release are not enough to show the existence of consideration—there must be evidence to show that there was in fact an honest dispute in good faith. *Sappington v. Central Mutual Ins. Ass'n.*, 229 Mo. App. 222, 77 S.W.2d 140 (1934)."

■ As above demonstrated there was no real basis or any good faith dispute in any of the allegations of Dickey's declaratory judgment suit. Facts detailed below demonstrate that Hines and Dorsey joined Dickey in the purpose of that suit. There is no showing that Van Tuyl and Appleton joined in it or instigated it, but assuming for the purpose of their attempting to show that real disputes existed, the declaratory judgment suit, for reasons stated, avails them

nothing to aid their plea for specific performance of the December 15, 1971 agreement. All that appears with respect to the time of filing of the declaratory judgment suit under the evidence and a fair construction of the bank sale contracts, is that appellants, without any legitimate reason, failed to perform their clear contractual obligations. There is lacking a bona fide dispute, and in that aspect there is no consideration for the December 15, 1971, agreement.

Appellants claim also that there is consideration in the fact that Hines, Dorsey and Van Tuyl released the stock in the Brookfield bank from any claim of lien by them which they had under the sale agreement. The fact is that any lien upon that stock had been extinguished by August 25, 1971, by Venturers' exercise of the 185.2% charge back provision of the bank sales contracts to their notes to sellers. It is not contended that the charge back provision was improperly exercised for any reason. There were thus no liens to release at the time of the December 15, 1971, agreements, and no loss or forbearance could serve as consideration for that agreement. Appellants say that consideration for the new agreement existed in their giving up their rights in Venturers $1,300,000 purchase money notes, for a lesser amount, $350,000, a benefit to Venturers and a loss or forbearance to appellants. Again, those purchase money notes had been extinguished by the exercise of the right of the 185.2% charge back provision. Appellants attempt to create a consideration in the fact that the Exhibit A and B obligations were paid or scheduled for payment in January, 1972, by Dickey and Hines. The record is unclear as to precisely what payments were actually made under these exhibits, or to what banks any payments were credited. The evidence is that these obligations were required to be paid as F.D.I.C. commitments under the original sale contracts. They thus furnish no new consideration for the December 15, 1971, agreement. *City of Bellefontaine Neighbors v. J. J. Kelley Re-*alty *and Building Co. v. Powers Interiors, Inc.,* 456 S.W.2d 632, 637[3–5] (Mo.App. 1970); *Mt. Vernon Car Mfg. Co. v. Hirsch Rolling Mill Co.,* 285 Mo. 669, 227 S.W. 67, 74[5] (Mo.1920).

■ At least as to Hines, Dickey and Dorsey, as below noted, there was financial duress placed upon Johnson which forced him to take steps to sell the Brookfield bank, which of necessity entailed his entering into the December 15, 1971, contract. As to them, this was an additional reason for the court to deny specific performance. *Brown v. Worthington,* 162 Mo.App. 508, 142 S.W. 1082, 1084[2] (Mo.App.1912); Anno. 79 A.L.R. 655; 32 Tulane L. Review 512 (1958). There is no necessity to consider the effect of late payment by Dickey of the obligations listed in Exhibit A to the December 15, 1971, contract.

■ Dickey and Dorsey, by their Points IV, claim that "the Judgments and Damages are Inequitable, Unconscionable and Unjustly Enrich (respondents)." Van Tuyl claims that the denial of specific performance will result in unjust enrichment to respondents. Dickey's and Dorsey's arguments are that Thirty-Seven Venturers bought the Brookfield bank for $341,056.00 cash, and gave notes to Dickey, Dorsey and Van Tuyl totalling $823,744, none of which were paid. They say that the court's finding of fact No. 32 concluded that Johnson and Thirty-Seven Venturers were not obligated to pay anything on the notes. That is not what finding of fact No. 32 says. It merely notes that the interest was paid, totalling $31,011.06, through September, 1971, and "On *August 25, 1971,* the delinquent receivables as specified in the February 25, 1971 charge back notice which remained uncollected exceeded $1,300,000, thereby extinguishing the promissory notes in said aggregate amount which had been delivered by the Venturers corporations to the respective sellers on November 27, 1970." (Italics added.) As noted above, that was the situation as of the italicized date, and indeed, again as noted above, the

F.D.I.C. commitments alone at 185.2% exceeded buyers' notes. There is no issue in this case as to respondents' liability on the unpaid $1,300,000 purchase money notes. The suit here was for specific performance of the December 15, 1971, agreement, and counterclaims for damages occasioned by the forced sale of the Brookfield bank, and interference with an escrow agreement. The damages awarded have nothing to do with any unjust enrichment. No issue is presented by reason of subsequent collection of any part of the obligations of debtors to the five banks as might arguably restore the capital requirements to them on any theory of unjust enrichment, penalty or forfeiture. Van Tuyl's position is similar to that of Dickey and Dorsey, and Appleton's is the same, he having adopted the points of Dickey's brief. There is no unjust enrichment here, as would authorize a decree of specific performance.

The trial court excluded respondents' Exhibit HH evidently upon the ground that it was a privileged communication between attorneys and clients, as to which the court stated, "I have grave doubts as to whether it is privileged in the first place." This exhibit was fully identified: Johnson testified that it was in the printing of Dorsey and a portion was in the handwriting of Hines, and also bearing the latter's initials. Dorsey admitted Exhibit HH to be in his printing, but claimed to have delivered it to the law offices of Morris in the spring of 1971, after he had received from Johnson the notice of delinquent bank obligations of February 25, 1971. Hines admitted that a portion of the document was in his handwriting. Exhibit HH was produced into court at trial from the files of the Morris law firm.

■ As further noted by the court, and developed by the cross-examination of Dorsey, there is, because of third person references to the sellers of the banks, considerable question as to whether Exhibit HH is a privileged communication from a client *directly* to his attorneys, or whether it would not have been discoverable from the client

prior to delivery to his attorneys. However, it would seem that even if a document is not directly addressed to counsel it could be privileged if it has a legitimate relation to pending or proposed proper legal representation. See 58 Am.Jur. Witnesses, §§ 499, 500, 501; pp. 280, 281; 8 Wigmore, Evidence, § 2307, p. 591, et seq. It is, however, unnecessary to pursue the question of privilege because an exception exists where the document produced has an import of an unlawful purpose, here that of a conspiracy to impose economic duress upon Johnson and his Venturers corporations until they would compromise the contracts for the sale of the banks. "Likewise, although there are some decisions apparently to the contrary, no privilege may be claimed for communications concerning the perpetration of a fraud, * * *. It is held in some jurisdictions that the communication is without privilege only in case of actual fraud involving moral turpitude, and is privileged in the case of fraud in law. In other jurisdictions, if one knowingly employs counsel or attempts to employ counsel for an illegal purpose, he is not entitled to the protection of secrecy; and if, without knowledge that his contemplated action is wrong, he consults an attorney, and is advised that it would constitute a civil wrong, and persists in such action, either by collusion with that attorney or by employment of another, he is likewise not entitled to the protection of secrecy; * * *." 97 C.J.S. Witnesses § 285, p. 811, et seq. [Note the letter of attorney, Morris, supra, advising Dickey, Hines, with blind copies to Van Tuyl and Dorsey, not to breach the contract, yet that advice was disregarded.] That a civil conspiracy constitutes a wrongful act of the same nature as fraud cannot be doubted. "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means." 15A C.J.S. Conspiracy § 1(1), p. 596; see also 7 Words and Phrases, "Civil Conspiracy," 382 and pocket parts; *Bently v. Wilson Trailer*

*Company,* 504 S.W.2d 277, 280[5] (Mo.App. 1973), and cases cited. And see *Contour Chair Lounge Co. v. Aljean Furniture Mfg. Co.,* 403 S.W.2d 922, 926[1–4] (Mo.App. 1966), as to combinations for the purpose of causing a breach of contract by one of the parties thereto, with resulting damage to the other, being an unlawful conspiracy. For further authority as to the non-existence of privilege, where the matter relates to a proposed unlawful act, see 8 Wigmore, Evidence, § 2299, p. 578.

Exhibit HH is a damning bit of evidence bearing upon Dorsey's intent to enter into a coercive conspiracy, and also by strong inference the like intent of Hines, he having joined in the exhibit in his own handwriting. It is dated March 12, 1971, and complains about Johnson's handling of the bank loans. Dorsey states, "He is going exactly by the contract, for one reason only to buy these banks for the down payment. * * What to do [nothing 'til after 3–31–71 (Interest payment due)]. Damn if I know— *sue him for anything* such as we as majority stockholders due (sic) not want to see minority stockholders hurt by his unbanker tactics (he wrote letter to them say large losses—damage to our reputations—anything—*maybe a suit will bring them over to talking—we ask for new contract lower purchase price* —we need to stall this 6 months determination of loans [Left margin—This is silly but book would be better than down payment only.]—It is my opinion that not makeing (sic) loans—losing deposits like they are now, they cannot continue to operate any longer than 6 months. They have large amts. time deposits on which they are paying 5%—5½ & 5¾—income is hard to come by—Fed Fund rate very low—Treas Bills same—Gov Bonds selling at premium—therefore rate reduced. You have to make loans to stay in business. *What do we care if suit is groundless, just as long as we time* (sic) *them up—Anything short of a damn lie for a suit* —as it is we can't be hurt any more than the way it stands now. Attorneys can always figure out some way to sue us—right or wrong—

and cause delay. *Delay* will hurt these boys cause nobody can run business without making money. * * * These guys are crooks, within law barely. Why can't we play the same way. Nit pick—Delay will help us not them. * * * " [Italics added.] Although rejected by the trial court, Exhibit HH may be considered by this court under Rule 73.01 3(c); *Menos v. Hodges,* 499 S.W.2d 427, 429[1–3] (Mo.1973).

■ Hines was the one who brought attorney Thomson into the matter. It was Thomson who filed the sham declaratory judgment suit on April 30, 1971, after he had written the letter of April 13, 1971, to Morris, Dickey and Hines expressing the intent of Dickey and Hines "to hold up these payments, knowing the risk of the bank's failure and the fact that counterclaims can be interposed in these actions against John." The conspiracy to place economic duress upon Johnson and his Venturers corporations was under way, and it continued to do so up to the time that Thomson told Fleischer that they were going to keep the financial pressure on Johnson until he was ready to compromise, and through the execution of the December 15, 1971, agreement. The record is clear that financial pressures were in fact exerted upon Johnson. He first had to borrow $200,000 to restore capital to the banks; the banks and persons from whom he borrowed money to purchase the banks threatened to call the loans; the Columbia Union bank expressed a desire not to continue as escrow holder; the F.D.I.C. and the Missouri Commissioner of Finance continuously exerted regulatory pressure that the F.D.I.C. commitment loans be removed from the banks, which pressure culminated in Johnson's decision to sell the Brookfield bank as "the only way out"; the regulatory authorities were in the banks ready to close them on December 15, 1971, unless the agreement of that date went through. Johnson testified that had sellers' F.D.I.C. commitments been honored there would have been absolutely no problem. All of the elements of an unlawful conspiracy of Hines, Dickey and Dorsey are

here shown: "In general, to constitute a civil conspiracy there must be: (1) Two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." 15A C.J.S. Conspiracy § 1(2), p. 599. Dickey, Dorsey and Hines are the two or more persons. The object to be accomplished was a coercive compromise of the agreements to sell the banks through a breach of those agreements, the conspiracy for which is unlawful under the *Aljean* case, supra. The meeting of the minds of these three is shown by Exhibit HH, and the expressions made by their counsel, which are overt acts "tainted with elements of deceit, trickery, or chicanery." 15A C.J.S. Conspiracy § 5, p. 607. The damages incurred were in the forced sale of the Brookfield bank for less than it was worth under the evidence, the proof of which is hereinafter discussed.

 Count VI of the counterclaim, upon which the trial court entered judgment for $19,714.33 actual damages, and by reason of a finding of wrongful acts, assessed punitive damages along with Count VII, was for damages sustained by reason of sellers' wrongful interference with an escrow agreement of Johnson and his Venturers corporations with the Columbia Union National Bank wherein certain bank stock and other collateral exceeding $3,000,000 was originally deposited. Counter-claimants alleged that they were entitled to release of all the collateral on January 12 and 13, 1972, and redelivery of same to them. It was further alleged that sellers directed and demanded and induced Columbia Union not to release the collateral "as a part of their continuing efforts to impose upon counter-claimants financial duress and coercion." On January 5, 1972, Thomson wrote Dickey that he and Hines should hold back payment of $95,000 owed because Johnson had failed to go through with the December 15, 1971, agreement and pay $95,000 cash, "You and Hines should work

out who is to hold back the $95,000. We will then tie up Johnson's bank stock at the Columbia Union until he complies with the agreement." On January 4, 1972, Thomson wrote Columbia Union: "We write as attorneys for Mr. John Dickey, who has a lien on certain bank stock held by your bank in connection with the Venturers Corporation. A new contract has been entered into, a copy of which is enclosed. Do not release this bank stock without Mr. Dickey's written consent." Johnson shortly thereafter tendered full payment of his indebtedness and requested release of the collateral, but Columbia Union refused because of Thomson's claim of lien. Since Thomson was and had been acting for Dickey, Hines and Dorsey in their clearly and convincingly proved conspiracy (*National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 50[36–38] (Mo. banc 1966)), the facts show that the conspiratorial coercion extended to the tying-up, under a claim of lien, on the demand of Thomson, of the collateral in escrow at the Columbia Union. As noted, no right to specific performance of the December 15, 1971, agreement existed, and thus no lien could exist by reason of the terms of that agreement. Sellers say that there was no proof of the value of the collateral consisting of the stock of the remaining four banks which was still deposited in the Columbia Union on January 5, 1972. The trial court found that value to be not less than $241,400 greater than the indebtedness secured by the first liens on the stock. The court then computed the damages by reason of the refusal of Columbia Union to deliver up the collateral (upon the finding that the refusal was wrongfully instigated by Thomson) at 6% interest per annum from January 5, 1972 to the date of the amended findings of fact and conclusions of law, February 22, 1974, or $19,714.33. The only change in the collateral pledged was the removal of the stock of the Brookfield bank occasioned by its sale. The total sale price of the five banks at the end of 1970, was $2,000,000. The original sale price of the Brookfield bank was $1,164,000, which deducted from

the total leaves a value of $836,000 for the stock of the remaining four banks. From the December 15, 1971, sale of the Brookfield bank, Johnson paid $355,000 on his original $725,000 debt to Columbia Union, leaving a balance of $370,000 thereon. Using the original value of the stock, $836,000, remaining, the value above the indebtedness is $466,000, an amount far in excess of the $241,000 found by the court, about which Johnson and his Venturers corporations do not here complain, and who also do not demonstrate how the court arrived at the figure of $241,000.

Appellants say that the evidence shows that there were other lien claimants to the collateral in the Columbia Union escrow, and that Thomson's act could not be the only reason for Columbia Union's refusal to deliver up the stock. The only evidence as to other liens are the first liens held by Johnson's original out-of-state lenders given them by the original pledge agreement. Appellants' argument ignores the evidence of Johnson's tender to Columbia Union, which if accepted would have discharged all the first liens. It is fairly deducible that Columbia Union's refusal was caused by Thomson's statement that Dickey claimed a lien, and the trial court did not err in so finding and awarding damages for that wrongful act.

As noted above the evidence fastens the taint of a wrongful civil conspiracy upon Hines, Dickey and Dorsey, acting in concert and through their attorney, Thomson. The evidence, however, is insufficient to tie Van Tuyl and Appleton to those wrongful acts, either by an original agreement, or as respondents argue, by ratification of the conspiracy. All that is existent as to Van Tuyl and Appleton is a mere suspicion that they joined with the others to impose financial duress and resultant damage to Johnson and his Venturers corporations, and that is not enough. *National Rejectors, Inc.,* supra. Lacking is any evidence that Van Tuyl and Appleton agreed with Dickey, Dorsey and Hines to put the squeeze on Johnson, either at the time of

the conspiratorial agreement, around March, 1971, or thereafter. "[B]efore a party can be held liable as a conspirator, it must be shown that he entered into an agreement with the other conspirators to accomplish the object of the conspiracy, since a person is liable as a conspirator only if he participated in the conspiracy by aiding and abetting it in some way." 15A C.J.S. Conspiracy § 17, p. 651; *Adams Dairy v. Burke,* 293 S.W.2d 281, 290 (Mo.1956); see also *Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.,* 435 S.W.2d 854, 857[4, 5] (Tex.1968). There is no direct evidence that they had knowledge of the sham declaratory judgment suit, or its purpose to force a compromise from Johnson. Hines assured Van Tuyl that the F.D.I.C. commitment obligations would be fulfilled when misunderstandings about the terms of the contracts were worked out. Van Tuyl urged Hines to pay the F.D.I.C. commitments. He had no personal obligations in those commitments, and in fact his own note at the Brookfield bank was secured by a certificate of deposit in greater amount. Van Tuyl's attorney, Morris, assured him that the F.D.I.C. commitments would be paid by those who actually owed them. Although there was some evidence that Van Tuyl was kept advised by Hines of the claimed controversies, in person 3 or 4 times a year, and by telephone 3 or 4 times per year, there is no showing that any advice related to the conspiratorial agreement. Van Tuyl did, as he had a right to do, deny his liability as the Venturers' counterclaim defendant and put the burden of proof on those corporations. He thought that Johnson signed the December 15, 1971, agreement because he was paying less money for the banks than he was obligated to do under the original sales agreements. Appleton's contacts with the other sellers in the critical time after the February 25, 1971, notice of default given by Johnson are even less minimal than Van Tuyl's. There is no evidence that either one was represented by Thomson in his express purpose to put the squeeze on Johnson until he

would compromise. Knowledge of the object of the conspiracy and intention to injure Johnson and his Venturers corporations can here rest only in suspicion and speculation, *Schlumberger,* supra, 435 S.W.2d 856[1]. The judgments against Van Tuyl and Appleton must therefore be reversed.

■■■ Appellants claim that the judgment for damages, $218,333.33, occasioned by the forced sale of the Brookfield bank for less than its value, is not supported by competent, believable evidence. Johnson testified that in the Brookfield community, a bank with ten million in operation, the charter itself is worth two times book value. The bank was sold for $655,000, which was one and one-half times book value, and "The very minimum is two times." In order to sell the bank Johnson had to take $500,000 in bad loans out of it, at a price of some $300,000 for those loans. It was his opinion that if the bad loans had been removed the stock was worth two and one-half times book value. Johnson was the owner of the Brookfield bank through his wholly-owned holding company, Thirty-Seven Venturers, Inc. He was shown thoroughly familiar with the banking business for many years, that knowledge extending to his Smithville bank in North Missouri. As owner of the Brookfield bank, he was competent to testify as to its value. 32 C.J.S. Evidence § 546(116), p. 435. Billy Mac Lamberson was produced as a witness and shown to have considerable knowledge of bank values in North Missouri, and his testimony, that the Brookfield bank was worth no more than the one and one-half times book value was certainly admissible. All of this conflicting testimony, however, was for the trial court to consider as to its credibility. *Farmers Mut. Fire and Lightning Ass'n v. La Vallee,* 501 S.W.2d 69, 74[2] (Mo.App.1973). Rule 73.01 3(b). Buttressing the trial court's finding that the value of the Brookfield bank was two times book value, is the fact that after it was sold the Citizens Bank of Newtown was sold at 242 per cent of book value "with obviously

a lot less potential at Newtown, Missouri, than there is at Brookfield, Missouri."

■■■ Appellants claim that the trial court erred in assessing punitive damages in addition to the actual damages awarded under Count VI (for wrongful interference with the Columbia Union escrow agreement to which appellants were not parties). Actually, by finding "(i)" the trial court found "that the acts and conduct of plaintiffs complained of in Counts VI *and VII* of the counterclaims were willful and without legal justification and that the defendants counterclaiming in Counts VI and VII are entitled to recover punitive damages from plaintiffs." (Italics added.) Certainly the conspiratorial acts of Dickey, Dorsey and Hines, above related, were willful, wanton and malicious, and the award of punitive damages against them was proper. *Mills v. Murray,* 472 S.W.2d 6, 17[18, 19] (Mo.App. 1971), and cases and authority there cited.

Appellants claim that the trial court erred in sustaining a motion to dismiss their petition against the Citizens Bank of Brookfield, which was a party to appellants' suit for specific performance. As discussed above, there was no merit in the suit for specific performance and the court did not therefore err in dismissing it as to the Brookfield bank.

The judgment denying specific performance of the December 15, 1971, agreement is affirmed as to all appellants. The judgments against appellants, Cecil Van Tuyl and Edward Appleton, upon Counts VI and VII, and for punitive damages, are reversed. The judgments against appellants, John M. Dickey, William C. Hines and Robert S. Dorsey, under Counts VI and VII, and the individual judgments against them for punitive damages are affirmed.

All concur.